Johnny Lee GATES, Petitioner–Appellant,

v.

Walter ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent–Appellee.

No. 87–8870.

United States Court of Appeals, Eleventh Circuit.

Jan. 6, 1989.

---

George H. Kendall, Legal Defense Fund, Ronald J. Tabak, New York City, for petitioner-appellant.

Mary Beth Westmoreland, William B. Hill, Jr., Asst. Attys. Gen., State of Ga. Dept. of Law, Atlanta, Ga., for respondent-appellee.

Before FAY, VANCE and ANDERSON, Circuit Judges.

PER CURIAM:

Petitioner Johnny Lee Gates appeals the district court's judgment denying his application for a writ of habeas corpus. We affirm.

## I. FACTS

Katrina Wright, the victim in this case, was a native of West Germany. In February 1976 she married an American soldier, Gregory Wright, and moved with him to this country. On November 19, 1976, they moved into the Fountain Court Apartments in Columbus, Georgia because Gregory was stationed at nearby Fort Benning.

On November 30, 1976, Gregory left around 6:00 a.m. to go to work. His wife was still in bed. When Gregory returned around 1:30 p.m., the door to their apartment was open. He entered the apartment and found his wife lying dead on the floor. Her hands were tied behind her back. She was gagged and blindfolded. She had been shot once in the head with a .32 caliber pistol. An examination of her body revealed evidence of rape.

The police found that $480 the Wrights had hidden under the mattress was missing. Beyond that, they found little useful physical evidence at the scene. The next day a neighbor, Donald Hudgins, told the police that he had been home for lunch the previous day. During that time, a black man knocked on his door and identified himself as being from the gas company. The man told Hudgins that his gas would be shut off for a short period and Hudgins made no objection. During this brief encounter, Hudgins noticed that the man appeared nervous and tried to look beyond him into the apartment. Hudgins also noticed that the man's rear pocket appeared to contain a bulky object.

Some two months later, the Columbus police arrested Johnny Lee Gates, who is black, on an unrelated murder charge. After noting similarities between that case and the Katrina Wright case, the police approached Gates concerning the Wright case. Gates then gave a written statement implicating himself in the death of Katrina Wright.

Gates described the events as follows. On the day of Katrina's murder, he borrowed a .32 caliber pistol from a friend in order to "pull a robbery." He then took a city bus to the Fountain Court Apartments where he planned to gain entry into an apartment by posing as a serviceman from the gas company. Upon arriving at the apartments, Gates had the encounter with Hudgins. He described it much as Hudgins had. Gates then proceeded to the Wrights' apartment. He knocked on the door and Katrina answered. He told her that he was from the gas company and she replied that she had called the gas company the day before. She directed him to the heater where she handed him an oil can. He oiled the belt on the heater. He went to the bathroom to wash his hands and Katrina followed him. He told her that he was there to rob her. Continuing his description, Gates said that Katrina told him that she had no money and that all he could get from her was sex. He then took her to the bed and had sex with her. Afterwards, Gates pulled the gun out and again demanded money. Katrina gave him the $480.

Gates bound her with the belt from her bathrobe and with some of Gregory's neckties. As Gates started to leave, Katrina threatened to identify him and tried to kick him even though she was bound, blindfolded, and gagged. Gates shot her in the head and ran away. Later that day, he returned the pistol he had borrowed.

After giving the written confession, Gates was asked to go with police to the scene of the crime and give a videotaped confession. He consented and the tape was made. In the tape, which lasted approximately fifteen minutes, Gates wore handcuffs. Although the handcuffs were not always visible, it was obvious from the position of his arms that he wore handcuffs throughout. The tape showed Gates walking through the apartment and responding to an officer's questions. Gates described the events much as he had in his written confession.

During the trip to the apartment, the police closely examined the heater that they had overlooked in the earlier investigation. In doing so, they found Gates' fingerprint. A fingerprint expert testified at trial that this fingerprint could have lasted two months because it had been made with the oil Gates used on the heater.

Shortly after the trip to the apartment, the police arranged a lineup that included Gates. From the lineup, Donald Hudgins identified Gates as the man he saw at the apartment the day of Katrina's murder. As Gates was returning to his cell after the lineup, he told a police officer that Hudgins was the man he had seen at the apartments on the day of the murder. At Gates' subsequent trial, Hudgins also identified Gates as the man who had come to Hudgins' apartment the day of the murder.

## II. PROCEDURAL HISTORY

On March 15, 1977, Gates was indicted by a grand jury in Muscogee County, Georgia on the charges of malice murder, armed robbery, and rape. Ten days later, Mr. William Cain was appointed to defend Gates. After talking to Gates and reviewing the state's case against him, Cain realized that saving his client from the death penalty would be a difficult task. The evidence of guilt against Gates was overwhelming and Cain could find no witnesses who would be willing to testify on Gates' behalf at either the guilt/innocence phase or the sentencing phase of the upcoming trial. Cain therefore decided that Gates' best chance for escaping the death penalty would be to take the stand during the sentencing phase, admit his guilt, and plead for mercy.

Gates' ensuing trial by jury resulted in his conviction on all three charges. On Cain's advice Gates initially had agreed to take the stand during the sentencing phase

and plead for his life. When the sentencing phase began, however, Gates decided not to testify. The jury sentenced Gates to death on the murder charge. The judge imposed consecutive twenty year sentences on the armed robbery and rape charges.

On October 24, 1979, the Georgia Supreme Court affirmed Gates' convictions and sentences including the death sentence. *Gates v. State*, 244 Ga. 587, 261 S.E.2d 349 (1979). The United States Supreme Court denied certiorari on March 17, 1980. *Gates v. Georgia*, 445 U.S. 938, 100 S.Ct. 1332, 63 L.Ed.2d 772 (1980).

Gates then filed a petition for writ of habeas corpus in the Superior Court of Butts County, Georgia. That court denied all relief in an unpublished opinion dated January 16, 1981. On May 14, 1981, the Georgia Supreme Court, without written opinion, denied Gates' application for probable cause to appeal. The United States Supreme Court denied certiorari on June 27, 1983, *Gates v. Zant*, 463 U.S. 1213, 103 S.Ct. 3551, 77 L.Ed.2d 1398 (1983), and denied Gates' application for rehearing on September 8, 1983, *Gates v. Zant*, 463 U.S. 1249, 104 S.Ct. 36, 77 L.Ed.2d 1455 (1983).

Having exhausted his state remedies, Gates brought an action seeking federal habeas relief in the Middle District of Georgia on October 7, 1983. On September 12, 1985, the district court denied all relief in an unpublished opinion. The court denied Gates' timely motion for amendment of the judgment in an unpublished order dated October 8, 1987. On November 9, 1987, the court granted Gates' motion for a certificate of probable cause to appeal. This appeal followed.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Gates' first contention on appeal is that he was denied his sixth amendment right to the effective assistance of counsel at trial. In evaluating this claim, the district court was not bound by the previous state habeas determination that Gates received effective assistance of counsel; to the contrary, the court's duty was to decide independently whether Gates received effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (both performance and prejudice components of ineffectiveness inquiry are mixed questions of law and fact). It also is the duty of this court to decide independently whether Gates received effective assistance of counsel; we are bound neither by the determination of the state habeas court nor by the determination of the district court. *See id.; Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir.1985), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).[1]

■ Ineffective assistance of counsel claims fall into two categories. In the first category are claims that the government violated the defendant's right to the effective assistance of counsel by impermissibly interfering with counsel's ability to make

---

1. Gates argues that we should remand this case for an evidentiary hearing at the district court level if we have substantial doubt as to whether Gates received effective assistance of counsel. A federal evidentiary hearing, however, is not necessary to resolve Gates' ineffective assistance claim. Such a hearing would be warranted only if there were material facts related to Gates' claim that were not adequately developed at the state level. *See* 28 U.S.C. § 2254(d)(3) (1982); *Thomas v. Zant*, 697 F.2d 977, 980 (11th Cir.1983). As we shall discuss, the appropriate legal standards for judging Gates' ineffectiveness claim are the performance and prejudice prongs of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In arguing that his counsel's performance was defective, Gates points exclusively to material facts (acts or omissions of Mr. Cain, his trial counsel) that were developed in the state habeas proceeding, in which Gates also raised an ineffective assistance of counsel claim. Thus, we shall decide whether Cain's performance was defective by independently applying the legal standards announced in *Strickland* to the material facts (certain acts or omissions of Cain) related to that question as developed in the state habeas proceeding, without the need for an additional evidentiary hearing at the federal level to develop more facts. Because we conclude that Cain's performance was not defective, we also are able to resolve Gates' ineffective assistance claim without the need for a federal evidentiary hearing on the *Strickland* prejudice prong. References throughout this opinion to Cain's actions in defending Gates and Cain's reasons for taking these actions are drawn from the record of the state habeas proceeding.

independent decisions about how to conduct the defense. *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063–64. In the second category are claims that the defendant was deprived of his right to the effective assistance of counsel because his counsel, whether retained or appointed, simply failed to provide adequate legal assistance. Claims in the second category are called "actual ineffectiveness claims." *Id.* This is the only type of ineffectiveness claim Gates properly raises before this court.[2]

In *Strickland*, the Supreme Court established a two-pronged test for evaluating "actual ineffectiveness" claims. Under the first prong, a reviewing court must determine whether counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the sixth amendment. Under the second prong, the court must determine whether counsel's performance, if deficient, prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The defendant must prevail on both the performance and prejudice prongs to sustain an actual ineffectiveness claim.

Under the performance prong of *Strickland*, a convicted defendant must identify the specific acts or omissions he alleges were not the result of reasonable professional judgment on the part of his counsel. The court then must decide whether, in light of all the circumstances facing trial counsel, his conduct fell within the wide range of professionally competent assistance expected of an attorney. *Strickland* teaches that courts must judge the reasonableness of the challenged conduct on the facts of the particular case, viewed as of the time of the conduct. Courts always must "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* at 690, 104 S.Ct. at 2066. Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

With these principles in mind, we conclude that Cain's performance was not so defective as to render his assistance ineffective within the meaning of the sixth amendment. At issue is Cain's failure to raise the challenge that blacks and women were unconstitutionally underrepresented on the petit jury venire.[3] Cain testified that he did not raise such a challenge for two reasons, both of which were based on his own observations and experience. First, he did not believe a jury composition challenge would be successful. Second, he believed that such a challenge might alienate the jury that eventually would be empaneled to try the case. Cain came to these conclusions because (1) he was not aware of any specific evidence that the jury commissioners in Muscogee County were intentionally discriminating against blacks and women in composing the jury list, (2) in the past he had observed many panels drawn from the jury list in Muscogee County in which nearly fifty percent of the members were black, and (3) it was the consensus of many of the other leading criminal defense lawyers in the area that such challenges were not in the best interests of defendants.[4]

---

2. Gates attempts to raise a governmental interference with counsel claim by alleging that the trial judge prevented him from asking potential jurors whether they would automatically vote for the death penalty if they found Gates guilty. Gates, however, did not assert this claim in his federal habeas petition; therefore, he is barred from raising it on appeal.

3. Gates also alleges that Cain's assistance was ineffective because he did not raise the challenge that blacks and women were unconstitutionally underrepresented on the county jury list from which the grand jury was selected. We conclude that Cain's decision not to challenge the county jury list was reasonable for the

same reasons it was reasonable for him not to challenge the petit jury venire. Furthermore, the overwhelming evidence of guilt in this case is such that any grand jury would have indicted Gates on the same charges; hence, raising such a challenge, even if successful, merely would have delayed Gates' trial. Thus, there is no question that it was reasonable for Cain not to make such a challenge.

4. Gates suggests in his brief that Cain was more concerned about alienating jurors in future cases than he was about alienating the jury that was to decide Gates' case. Our reading of the entire record of the state habeas proceeding,

Gates argues that it was unreasonable for Cain to rely on his own experience and judgment in deciding not to challenge the jury list, contending that he should have conducted a more substantial investigation into that particular line of defense before deciding whether to raise it. According to Gates, had Cain researched the matter thoroughly, he would have discovered a statistical disparity of at least 13% between the percentage of blacks in Muscogee County as a whole and the percentage of blacks on the jury list. This information, Gates argues, along with the knowledge that Muscogee County jury commissioners had substantial discretion in selecting the petit and grand jury venires, would have been sufficient to allow Cain to establish a *prima facie* case of unfair and unreasonable underrepresentation.

We agree that by making these allegations Cain could have stated a *prima facie* case of jury discrimination. *See Berryhill v. Zant*, 858 F.2d 633, 638 (11th Cir.1988) (law accords defendant with presumption of unfairness upon bare showing of underrepresentation). This does not mean, however, that a jury list challenge would have been successful, *see id.* (state may rebut presumption by showing that underrepresentation was not unfair and unreasonable), nor does it mean that Cain's performance was defective because he decided not to raise such a challenge without the benefit of the more substantial investigation Gates proposes. Ideally, all trial counsel should substantially investigate all plausible lines of defense before rejecting any for strategic reasons. The courts have recognized, however, that this is not always required for counsel to be effective within the meaning of the sixth amendment. *See Washington v. Watkins*, 655 F.2d 1346, 1356 (5th Cir. Unit A 1981) (" '[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers.' ") (citation omitted) (brackets original). Given the finite resources of time and money that face a defense attorney, it simply is not realistic

to expect counsel to investigate substantially all plausible lines of defense. A reasonably competent attorney often *must* rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forgo a particular line of defense. Consequently, counsel has rendered effective assistance even though he decided not to pursue a particular line of defense without substantial investigation so long as the decision was reasonable under the circumstances. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066 ("[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary.") (emphasis added).

In *Birt v. Montgomery*, 725 F.2d 587 (11th Cir.1984) (in banc), *cert. denied*, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984), a case also involving a trial counsel's decision not to raise a jury list challenge, we enumerated three factors to assist courts in determining whether a decision to forgo a plausible line of defense without substantial investigation was reasonable under the circumstances. The first *Birt* factor to consider is the attorney's experience and general awareness that the rejected line of defense was available. *Id.* at 600. The more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense without substantial investigation was reasonable under the circumstances. Likewise, if an attorney is aware of a line of defense and makes a conscious decision to reject it, rather than failing to raise it simply because he was unaware it existed, it is more likely that the failure to raise the defense was reasonable. In the present case, at the time of Gates' trial Cain had been practicing law for nearly thirty years. He had tried over twenty-five criminal trials, six to eight of which involved the death penalty. There also was no question that Cain was fully aware of the ability to raise the jury discrimination

however, convinces us that Cain's decision not to raise a jury composition challenge was motivated solely by his concern for his client.

challenge. In short, Cain's decision was not one resulting from inexperience or ignorance; rather, it was the conscious decision of an experienced criminal defense lawyer. Consequently, the first *Birt* factor strongly points to the conclusion that Cain's decision was reasonable.

The second *Birt* factor to consider is the possible inconsistency of the rejected defense with the overall defense strategy. *Id.* The more inconsistent the rejected defense was with the overall defense strategy, the more likely it is that the decision to reject the defense was reasonable. Cain testified that he actually would have preferred having as few women as possible on the jury. (Apparently, this was because the victim was a woman and the crime involved violent sexual assault). Making a jury venire challenge that could have resulted in more women being on the petit jury that eventually tried the case would have been inconsistent with Cain's overall defense strategy. On the other hand, a successful jury composition challenge also could have resulted in at least one black being selected to serve on the jury that ultimately decided the case. This conceivably could have improved Gates' chances of not receiving the death penalty. *See Turner v. Murray*, 476 U.S. 28, 35, 106 S.Ct. 1683, 1687–88, 90 L.Ed.2d 27.[5] The second *Birt* factor, therefore, is either nondeterminative or at best slightly favors a finding that Cain's decision not to challenge the jury list without substantial investigation was unreasonable.

The third *Birt* factor to consider is the foreseeable prejudice that might have resulted had the defense not been rejected. *Birt*, 725 F.2d at 601. The more likely it is that raising a particular line of defense would result in prejudice to the defendant's overall case, the more likely it is that rejection of the defense without substantial investigation was reasonable. This factor in the present case favors the conclusion that Cain's decision was reasonable. Cain was concerned that the jury that eventually tried Gates would become alienated against Gates if it became aware that a challenge to the county jury list had been made. This was no small concern in a case in which the only real hope of saving the defendant from the death penalty was through a plea of mercy. If such a challenge were successful,[6] the jury commissioners would have had to create a new master jury list and to discard the old one. This would have resulted in delay and the dismissal of potential jurors already called to the courthouse under the old list. There was no way that Cain could be guaranteed that the final jury that would decide Gates' fate, a jury selected from a new list, would be unaware of the previous challenge. The jury might very well view the challenge as an attempt by Gates to avoid punishment on a "technicality." Lawyers and judges may realize that "technicalities" generally are legal safeguards designed to ensure that the accused receives a fair trial. Experienced criminal defense lawyers recognize, however, that this is not always the view of the layman. They therefore often go to extremes to avoid any possibility that the jury might learn that they are raising a "technicality."

Our consideration of the *Birt* factors, particularly the first and third factors, points to the conclusion that Cain's decision not to raise a jury list challenge, even if made without substantial investigation, was reasonable under the circumstances. Cain, an experienced criminal defense lawyer, made the reasonable decision to reject the idea of a jury list challenge on the grounds that the potential prejudice to his client outweighed the potential benefit of obtaining a black juror. We cannot ignore the Supreme Court's admonition in *Strickland* that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal lawyers would not defend a particular client in the

---

5. Because of the overwhelming evidence of guilt in this case, we do not believe that increasing the odds that blacks would be selected to serve on the jury would have improved Gates' chances of obtaining an acquittal.

6. If the challenge were unsuccessful, of course, it could not have helped Gates' case and it might have hurt his chances of avoiding the death penalty.

same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Nor may we disregard the Court's admonition against second-guessing counsel's decision from afar:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id.* Consequently, we conclude that Cain's performance was reasonable under the circumstances.[7]

We have previously stated that Gates must prevail on both the performance and prejudice prongs of *Strickland* to sustain his ineffectiveness claim. Because he has not prevailed under the performance prong, his ineffective assistance of counsel claim fails, obviating our need to address the *Strickland* prejudice prong. *See id.* at 697, 104 S.Ct. at 2069–70.

## IV. UNCONSTITUTIONAL PETIT JURY VENIRE

 Gates attempts to raise the unconstitutional petit jury venire claim on its merits. While he fashions this argument as a basis for reversing the district court's judgment that is independent of his ineffective assistance of counsel claim, our analysis reveals that the two claims are dependent, not independent. Under Georgia law a criminal defendant who fails to make a timely jury challenge at trial is barred from raising the issue in a later state proceeding absent a showing of cause for failing to raise the objection below. *See* Ga.Code Ann. §§ 15–12–162, 9–14–42(b); *Amadeo v. State,* 243 Ga. 627, 255 S.E.2d 718, 720 (1979), *cert. denied,* 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). A defendant who is procedurally barred from raising a federal constitutional claim in state court is also barred from raising the claim in a federal habeas petition unless he can show cause for and actual prejudice from making the default. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The only possible cause that Gates offers to excuse his failure to challenge the jury composition is that his counsel was ineffective. We have already concluded, however, that Cain's assistance was not ineffective. Gates therefore is barred from raising the petit jury list claim on federal habeas review.

## V. VIDEOTAPED CONFESSION

Gates raises two challenges to the admission of his videotaped confession. The first is that he did not receive proper warnings that the confession could be used against him in court. The second is that the videotape, by showing Gates in handcuffs, was unduly prejudicial. We consider each in turn.

### A. *Warning Issue*

 It is well-settled law that a criminal defendant must be properly advised of his rights before he can be subjected to custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In this case, the parties do not dispute that Gates received a *Miranda* warning that would be sufficient under normal circumstances. The problem arises here because the confession was videotaped. Gates contends that the *Miranda* warning was inadequate in that it did not specifically advise him that the visual im-

---

7. Gates alleges that several other acts or omissions of Cain were unreasonable. Most of these allegations were not raised in Gates' federal habeas petition and therefore we will not consider them on appeal. We have carefully considered his other allegations of unprofessional conduct on the part of Cain that were raised in his federal habeas petition and conclude that they have no merit. Only one warrants discussion. This allegation is that Cain acted unreasonably by advising Gates to plead guilty to an unrelated murder charge, a plea that was used against Gates during the sentencing phase of this case. Gates, however, did not allege in his federal habeas petition that, but for Cain's advice, he would have pleaded differently to the other murder charge. Thus, he has failed to allege the kind of prejudice under the second prong of *Strickland* necessary to sustain an ineffectiveness claim on this ground. *See Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

ages the camera was recording could be used against him at his subsequent trial.

After viewing the videotape, we conclude that Gates knew that the confession he was giving was being videotaped and that the visual images that were being recorded could be used against him at trial. At the beginning of the tape, Gates and a police officer stood at the door of the Wrights' apartment. The police officer gave some identifying information and then advised Gates of his rights from a standard *Miranda* card. During this time and throughout the tape, Gates often looked directly into the camera. Thus, it is clear that Gates was aware that he was being recorded on videotape. There is no evidence that Gates had below normal intelligence. Under the circumstances we conclude that Gates could not have thought that the visual images being recorded on the videotape would not be used against him.[8]

### B. *Handcuff Issue*

Gates' other challenge to the videotaped confession is that its admission was unduly prejudicial because it portrayed him in handcuffs. As we have noted previously, although the handcuffs are not always visible, it is evident throughout the fifteen-minute tape that the defendant is handcuffed. We are aware of no cases which address the propriety of handcuffing during a videotaped confession. Nonetheless, the resolution of the issue is apparent from earlier cases addressing handcuffing in and around trials.

The principal difficulty arising from shackling or handcuffing a defendant at trial is that it tends to negate the presumption of innocence by portraying the defendant as a bad or dangerous person. The Supreme Court has referred to shackling during trial as an "inherently prejudicial practice" which may only be justified by an "essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560,

569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). *See also Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). This court recently has extended the general prohibition against shackling at trial to the sentencing phase of a death penalty case. *Elledge v. Dugger*, 823 F.2d 1439, 1450–52 (11th Cir.1987), *modified*, 833 F.2d 250 (1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).

On the other hand, a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. *Allen v. Montgomery*, 728 F.2d 1409, 1414 (11th Cir.1984); *United States v. Diecidue*, 603 F.2d 535, 549–50 (5th Cir.1979), *cert. denied sub nom. Antone v. United States*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); *Wright v. Texas*, 533 F.2d 185, 187–88 (5th Cir.1976); *Jones v. Gaither*, 640 F.Supp. 741, 747 (N.D.Ga.1986), *aff'd without opinion*, 813 F.2d 410 (11th Cir.1987). The new fifth circuit is among those circuits which adhere to this rule. *King v. Lynaugh*, 828 F.2d 257, 264–65 (5th Cir. 1987), *vacated on other grounds*, 850 F.2d 1055 (5th Cir.1988); *see also United States v. Williams*, 809 F.2d 75, 83–86 (1st Cir. 1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877, 96 L.Ed.2d 377 (1987); *United States v. Robinson*, 645 F.2d 616, 617–18 (8th Cir.1981), *cert. denied*, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). In these latter cases, the courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.

Thus, the case law in this area presents two ends of a spectrum. This case falls closer to the "brief viewing" end of the spectrum and requires a showing of actual prejudice before a retrial is required. The prosecution showed the fifteen-minute tape twice during several days of trial. The

---

**8.** Although we suspect that videotaped confessions will be increasingly used, we do not intend to state any general rule as to their *Miranda* implications. Our holding is limited to the particular facts of this case. *Cf. Hendricks*

*v. Swenson*, 456 F.2d 503 (8th Cir.1972) (discussing the admissibility of videotaped confessions and the *Miranda* warning that was given in that case).

handcuffs were only visible during short portions of the tape.

Gates has made no attempt to show that he suffered actual prejudice because the jury saw him in handcuffs. Our independent examination of the record also persuades us that he did not suffer any prejudice. Although defense counsel strenuously objected to the admission of the videotape, he did not object to the handcuffing in particular. He did not ask for a cautionary instruction or a poll of the jury. Furthermore, the videotape at issue here was taken at the scene of the crime, not at the police station. Thus, jurors likely would infer that handcuffing was simply standard procedure when a defendant is taken outside the jail. The viewing of the defendant in handcuffs on television rather than in person further reduces the potential for prejudice. In light of the foregoing facts, and the fact that Gates sat before the jury without handcuffs for several days during his trial, we conclude that the relatively brief appearance of the defendant in handcuffs on the videotape did not tend to negate the presumption of innocence or portray the defendant as a dangerous or bad person. We therefore conclude on the particular facts of this case that the handcuffing of Gates during the videotaped confession does not require a new trial.

## VI. INSTRUCTION ON MALICE

Gates contends that the trial court's instruction on malice improperly shifted the burden of proof to him in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In considering *Sandstrom* claims, we must consider whether the challenged instruction impermissibly shifts the burden and whether the error, if any, was harmless. *Bowen*

*v. Kemp*, 832 F.2d 546 (11th Cir.1987) (in banc), *cert. denied*, —— U.S. ——, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988). This court has already determined that the instruction given here shifts the burden of proof.[9] *Brooks v. Kemp*, 762 F.2d 1383, 1388–90 (11th Cir.1985) (in banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986).

A *Sandstrom* error is harmless when the evidence of the element of the crime to which the instruction relates is overwhelming or when that element is not in issue.[10] *Bowen*, 832 F.2d at 548. The evidence of Gates' malice is overwhelming. His own account of the murder demonstrates malice beyond any reasonable doubt. Gates argues that Katrina's kicking him and threatening to identify him somehow served to negate his malice, but this argument is not persuasive. Katrina was bound and gagged; therefore, Gates' testimony that she kicked him and threatened to identify him, even if believed, would not in any way tend to mitigate or justify the shooting. Thus, the *Sandstrom* claim has no merit.

## VII. PROSECUTOR'S CLOSING ARGUMENT AT SENTENCING

Gates argues that his trial was rendered fundamentally unfair by the prosecutor's closing argument at the sentencing phase of his trial. This court recently considered this issue exhaustively in four in banc opinions. *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (in banc), *vacated and remanded*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *aff'd on remand*, 809 F.2d 700 (11th Cir.1987) (in banc); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985) (in banc), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986); *William Boyd Tucker v. Kemp*, 762 F.2d 1480 (11th Cir.1985) (in banc), *vacated and remanded*, 474 U.S.

---

9. The challenged instruction was:
 Now, ladies and gentlemen, the law presumes every homicide [sic] to be malicious until the contrary appears from the circumstances of alleviation, excuse or justification, and it is incumbent upon the prisoner to make out such circumstances to the satisfaction of you ladies and gentlemen unless they

appear from the evidence produced against him.

10. Because of our conclusion that the evidence of Gates' malice was overwhelming, we need not address the state's argument that malice was not at issue.

1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *aff'd on remand,* 802 F.2d 1293 (11th Cir. 1986), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987); *Richard Tucker v. Kemp,* 762 F.2d 1496 (11th Cir.1985) (in banc), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986).

■■■ Gates challenges the following arguments: (1) the prosecutor's assertion that he sought the death penalty rarely and that he had made the careful judgment that this case warranted it; (2) the prosecutor's statement that he felt the death penalty was appropriate and that he would sleep better if Gates were given the death penalty; (3) the prosecutor's assertion that the cost of imprisoning Gates for life was a reason to impose death; (4) the prosecutor's assertion that jurors should fulfill their role as soldiers in the war on crime by imposing the death penalty; (5) the prosecutor's assertion that Columbus was no longer safe and that no one would ever get the death penalty again if Gates were given life; (6) the prosecutor's assertion that Gates was unjustified in relying on procedural safeguards the victim did not have; and (7) the prosecutor's references to personal characteristics of the victim.

After carefully reviewing the record, we have concluded that several of these arguments were improper under the four prosecutorial argument cases cited above. Considering the totality of the circumstances, however, these arguments did not render the sentencing proceeding fundamentally unfair. As in *Brooks,* the most troubling arguments are the "prosecutorial expertise" argument and the "war on crime" argument because of their tendency to mislead the jury as to its role. 762 F.2d at 1413–16. In this case, the improper arguments were more muted than in *Brooks.* The prosecutor's argument, the defense counsel's argument, and the judge's charge all repeatedly and clearly stated the correct

role of the jury in the sentencing proceeding. Thus, *Brooks* controls our decision.[11]

## VIII. CONCLUSION

Our review of the record reveals that Gates was not deprived of his constitutional right to a fair trial. The district court's judgment denying habeas relief is therefore

AFFIRMED.

---

11. We have also considered the extent to which any of the arguments tended to lessen the jury's role in the sentencing process, thus implicating concerns expressed in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In this regard, this case is like *William Boyd Tucker v. Kemp,* 802 F.2d 1293 (11th Cir.

1986), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987), in that the court's instructions to the jury, and the totality of the sentencing proceedings, made absolutely clear to the jury the proper role of the jury in the sentencing proceedings.