George DANIEL, Petitioner,

v.

Morris L. THIGPEN, et al.,
Respondents.

Civ. A. No. 87–D–1334–E.

United States District Court,
M.D. Alabama, E.D.

July 25, 1990.

Malcolm R. Newman, Newman & Newman, Dothan, Ala., Bryan A. Stevenson, Atlanta, Ga., William J. Barker, Stradley, Ronen, Stevens & Young, Philadelphia, Pa., for petitioner.

Don Siegelman, Atty. Gen., John Gibbs, Asst. Atty. Gen., Montgomery, Ala., for respondents.

## ORDER

DUBINA, District Judge.

In accordance with the Memorandum Opinion filed contemporaneously herewith, it is the ORDER, JUDGMENT, and DECREE of this court that the Amended Petition for Writ of Habeas Corpus be and the same is hereby GRANTED, and that the petitioner, George Daniel, be afforded a new trial within ninety days of the date of this Order.

## MEMORANDUM OPINION

This is a death penalty case. There is before the court an amended petition for writ of habeas corpus filed herein by George Daniel ("the petitioner") on May 15, 1989, and an answer thereto filed herein by Morris L. Thigpen, Commissioner, Alabama Department of Corrections, and W.E. Johnson, Warden, Holman Unit ("the respondents") on June 8, 1989. The parties have filed extensive memorandum briefs in support of their respective positions. In addition, the court conducted an evidentiary hearing on November 16, 1989.

## I. FACTUAL BACKGROUND

On January 25, 1981, the petitioner left his home in Houston, Texas, to travel by bus to Alabama. He apparently had enough money to get as far as Union Springs, Alabama, where the police allowed him to spend the night in jail. A police vehicle took him to the outskirts of Hurtsboro, Alabama, the next day. He was seen wandering around Hurtsboro during the afternoon and evening of January 27, 1981. Later that evening, he entered the home of Willie B. Lindsay, and said he wanted a place to stay. When he did not leave after being told he could not stay at the Lindsay home, Lindsay went to a neighbor's home to call the police. Officer George L. Claypool responded to the call.

According to the testimony of witnesses, a struggle ensued between the two men when the officer attempted to get the petitioner into his patrol car. Most of the witnesses saw only that the two men began to fight, fell to the ground, and rolled into a ditch, after which gunshots were heard. Lindsay testified that he saw the officer hitting the petitioner with a blackjack in an effort to get him into the car. One witness, Vincent Alexander, testified that the petitioner took the officer's gun and fired four or five shots at him as he lay on the ground. The witnesses saw the petitioner run from the scene after the shots were fired. Marshall Dent then saw the petitioner enter the Dent home, where he was apprehended. A .357 magnum pistol was in his possession, which was the same type of firearm used by Officer Claypool. The officer died as a result of bullet wounds to the abdomen.

The petitioner's family contacted Marcel E. Carroll about representing him. Carroll

filed a motion for preliminary hearing, but, when the petitioner was arraigned on February 12, 1981, Carroll did not appear. At that time, the trial court appointed J. Curtiss Bernard to represent the petitioner. The court received notice from Carroll on February 13, 1981, that he would provide no further representation unless he was retained by the petitioner's family. On April 3, 1981, Ruben K. King filed a notice of appearance on behalf of the petitioner after having been retained by his family. Bernard then indicated to the court that he would like to withdraw, but King asked the court to consider keeping Bernard in the case. On October 8, 1981, the court appointed both King and Bernard to represent the petitioner, and scheduled the case for trial on November 2, 1981. On October 19, 1981, King attempted to withdraw, relating to the court that the petitioner's family had sought to retain yet another attorney, Charles Price. The court replied by letter that if Price were retained and ready to proceed with trial on November 2, it would permit King to withdraw. The court also stated that it would expect King and Bernard to continue to represent the petitioner if Price was not prepared to try the case on November 2. King and Bernard represented the petitioner at trial.

Both of the petitioner's lawyers questioned his mental competence, and each filed a petition for psychiatric examination. The petitioner was examined on June 2 and June 11, 1981, by Robert A. Rose, Ph.D., a clinical psychologist, who recommended observation and further evaluation. The petitioner was admitted to Bryce Hospital[1] on August 7, 1981, where he was examined by Thomas L. Smith, M.D., a psychiatrist; tested by John H. Fancher, M.A., a psychologist II; and seen by Ed Seger, who purportedly had a Ph.D. in clinical psychology. Seger was subsequently discharged from Bryce in 1986 when it was discovered that he had falsely represented his credentials. The petitioner was discharged on September 15, 1981, with a final diagnosis of malingering. In addition to the diagnosis, the Bryce Hospital report to the trial court stated that the petitioner was not suffering from a mental illness at the time of his alleged criminal conduct, and that he was competent to stand trial and to assist his attorneys in preparing his defense.

Based at least in part upon the Bryce report, the petitioner's attorneys decided to abandon a contemplated insanity defense, and chose to proceed on the theory that he simply was not guilty. Although both lawyers continued to express doubts about the petitioner's mental competence, they did not request, nor did the trial court hold, a competency hearing. The record reflects little pretrial preparation. The only pretrial motions filed were a motion for the production of witnesses, the petitions for psychiatric examination referred to above, and a motion for continuance in order to have the petitioner evaluated. The attorneys stated that they visited Hurtsboro and that they interviewed members of the Daniel family about the petitioner's reported bizarre behavior before he abruptly left Houston.

The petitioner's trial began on November 2, 1981, in the Circuit Court of Russell County, Alabama. During the presentation of the state's case, the defense attorneys did cross-examine the state's witnesses, and made several objections to evidence sought to be admitted. During the course of the cross-examination of Alabama Bureau of Investigation ("ABI") agent Harold Newell, who took the petitioner's statement on the night of the shooting, King had Newell read the statement to the jury. It appears in the record as follows:

"I left Houston, Texas, on Sunday, January 25, 1981, by bus and went to Montgomery, Alabama. I asked the bus driver how much further could I go. The bus driver took me to the Police Station in Union Springs on Sunday, night time. I had been laid off from my job at Peir [sic] I Imports in Houston, Texas, where I was a fork lift driver. I came to Alabama to look for some of my folks that live in Montgomery, Alabama. My mother's name is Lillie Daniel. The police in Union Springs let me spend the night there. I left the Union Springs Police Department Monday morning or Tuesday

---

1. Bryce Hospital is a state-supported psychiatric facility in Tuscaloosa, Alabama.

morning. I went to a cafe up the street and got some breakfast. I left there and walked up the street where I knocked on a window at a place of business and was looking at a woman. I must have knocked too hard on the window because it broke. Someone must have called the police, they came and picked me up and took me to jail. They let me out sometime after dinner. One of the police officers took me somewhere to look for a job. I don't know where he let me out. I remember sitting on the railroad tracks throwing rocks and some white dude asked me what I was doing. It was getting close to dark and he told me I couldn't hang around there. I started asking some people at a house about a place to stay. I remember talking to a man and woman there; they told me there was a hotel down the road. I walked down the road but couldn't find the hotel. I went back to the house and asked them again if they knew a place where I could stay. I don't remember any police officer trying to put me in the police car. I remember going under a house and then I was standing in the kitchen of the house. I don't remember how I got there. I don't remember a gun shooting. I blacked out, like lights blinking. I have never blacked out before. I remember a lot of police coming in the house to get me. I don't remember fighting with a police officer." Signed: "George Daniel."

(Tr. at 266–68.) The statement was apparently introduced because King felt that those were "not the words of a black man." (Tr. at 402.)

When the prosecution rested, the petitioner's attorneys filed an oral motion to exclude the state's evidence, which was denied.[2] The defense then rested without presenting any evidence. The petitioner's lawyers filed one handwritten requested jury charge, which stated as follows:

I charge you Ladies & Gentlemen of the Jury that if you believe the evidence in this case you must return a verdict of not guilty.

(Tr. at 490.) That charge was refused. The trial court charged the jury, in pertinent part, as follows:

In this case the defendant George Daniel is charged with this—and I will read it to you—

"That he did unlawfully and with malice aforethought kill George L. Claypool by shooting him with a revolver while the said George L. Claypool was a police officer for the City of Hurtsboro, Alabama, and while the said George L. Claypool was on duty or because of said officer's performance of his official duty, to-wit: effecting a lawful arrest of the said George Daniel; the killing being in violation of a particular code and section of the laws of the State of Alabama."

Now, that is a charge of a capital felony under our laws. That sets forth what is a capital felony. There are a number of grounds for having a capital felony and one of those is the intentional killing of a police officer while in the line of duty. Now, while this is a capital felony, it also includes in it a lesser charge. That lesser charge is the offense of murder, which is not a capital offense, and I will define those for you in just a moment, but I read you that indictment to tell you the nature of the charge but also to tell you again that that indictment is not evidence in the case.

(Tr. at 302–03.)

Now, I advised you that you have to have a definition of murder. I want to give you the definition of capital murder and it is this: The crime of murder is committed by a person if that person causes the death of another person and in performing the act or acts which caused the death of the person, he intended to kill that person. That is one of murder. Or a person commits the crime of murder if under circumstances in which he manifests extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself and thereby causes the death of another.

---

**2.** As grounds for their motion, the petitioner's attorneys argued that the evidence presented by the state was insufficient to prove that the petitioner fired the fatal shots and that the petitioner had not been given an opportunity to consult a lawyer before participating in a lineup.

Now, that is the crime of murder, which is a lesser and included offense. To make it a capital murder, it would be a capital murder, if in addition to those the party intentionally killed was an officer in the line of his duty and that would make it a capital murder. So, I am only going to define murder for you in the one way. It is capital under the other circumstance when the person killed is an officer of the law in the official performance of his official duty.

Now, to sustain the charge in this case of murder, the State must prove beyond a reasonable doubt these elements: One, they must prove that George L. Claypool is dead. Second, they must prove that the defendant George Daniel caused the death of George L. Claypool and that he died as a result of the act of the defendant in shooting him with the pistol. Third, that in committing the act which caused the death, the defendant acted with the intent to kill—or this other phrase—or that under circumstances showing extreme indifference to human life, the defendant acted recklessly, engaging in conduct which created a grave risk of death to a person other than himself and in fact caused the death of George L. Claypool. Those are the elements that must be proved for murder. You take those same elements must be proven with one other element to make it capital murder. That other element is that Geroge [sic] L. Claypool was on duty or because of his performance of his official duty, he was killed. That would make it capital murder.

Now, what does intent mean? It means, really, that it was the defendant's purpose to cause the death of another person. It is the intentional doing of an act for which you would be responsible.

What would be reckless—acting reckless about something? This is another definition I need to give you. If a person acts recklessly with respect to a result or with respect to a circumstance, when he is aware of and he consciously disregards a substantial and unjustifiable risk that the result would occur or that the circumstance exists. Now, that risk that he is aware of and disregards must be of a

degree that would grossly deviate from the conduct that a reasonable person would observe in the same situation.

Now, those are the elements with one exception. The indictment says and goes further and says that George Daniel did unlawfully and with malice aforethought kill. Now, what is malice aforethought? What is malice itself? Let me define malice for you. Malice in law does not mean hate or ill will. It is defined as an unlawful act, willfully done without just cause or legal excuse. It is that mental state or condition which prompts you to do an unlawful act without any legal justification. Now, when a deadly weapon or when a weapon is used a jury may infer malice from the use of that weapon or they may not. You have the discretion. You may or may not infer from the use of a deadly weapon malice, unless the evidence which proves the killing also shows that it was perpetuated without malice. And whenever malice is shown to you by the evidence beyond a reasonable doubt, and it is unrebutted by the circumstances of the killing, then you could not justify any homicide less than that of murder.

So, malice is an unlawful act, willfully done, without just cause or legal excuse and you may infer malice from the use of a pistol if the circumstances warrant it in your opinion. You take that charge together with the other charges that I have given you on the definitions and let them speak to you.

(Tr. at 308–09.)

Now, in this case there are three possible verdicts that you can return and I am going to read you those verdicts at this time.

If upon the consideration of the evidence in this case you are not satisfied beyond a reasonable doubt of the guilt of the defendant, your verdict should be: We, the jury, find the defendant not guilty. The verdict should be dated, signed by a foreman or forewoman and returned to the Court.

If on the other hand, you deliberate and you are satisfied that the State has met its burden of proof and has proven to

you all the material allegations in the indictment, your verdict should be: We, the jury, find the defendant guilty as charged in the indictment.

If you feel from a review of all of the evidence—not if you feel but if you are satisfied beyond a reasonable doubt of the guilt of the defendant of murder but not of capital murder, your opinion would be: We, the jury, find the defendant guilty of murder.

(Tr. at 311–12.)

At the conclusion of the court's oral charge, defense counsel requested that the court charge the jury "that the fact that the defendant did not take the stand should not be taken as an indication of guilt." (Tr. at 313.) The court did so, after which defense counsel indicated that they were satisfied with the court's charge.

On November 3, 1981, the petitioner was convicted of capital murder of a law enforcement officer on duty in violation of *Ala.Code* § 13A–5–31(a)(5) (1975).[3] A sentencing hearing was conducted on November 4, 1981. The defense called four witnesses. Tommy Boswell, an investigator with the Russell County Sheriff's Department, testified that the petitioner did not have a prior criminal record. Lillie Daniel, the petitioner's mother, and Hazel Bampue, his sister, testified that he had never been in trouble before and that he did not recognize them and seemed confused when they visited him in jail after his arrest. Dr. Rose, who initially evaluated the petitioner's mental status, testified that the petitioner exhibited symptoms consistent with a major mental illness. The state called two witnesses. Newell, who took the petitioner's statement, testified that he had no trouble communicating with him. Ed Seger was called as a rebuttal witness to Dr. Rose's testimony. Seger testified extensively about the Bryce Hospital report and his opinion that the petitioner was not mentally impaired, but was malingering. The jury recommended a death sentence.

The petitioner was formally sentenced by the trial court on December 4, 1981, to suffer death by electrocution. The court found the following aggravating circumstances to support the imposition of the death sentence:

1. That the murder of Officer Claypool was committed at a time when he was a police officer for the City of Hurtsboro on duty and engaged in a job related act.
2. That the capital felony was committed for the purpose of avoiding or preventing a lawful arrest.

The court considered the following mitigating circumstances:

1. The defendant has no significant history of prior criminal activity.
2. That capital felony was committed while the defendant was alleged to be under some mental or emotional disturbance.

(Tr. at 496.) The court found that the aggravating circumstances outweighed the mitigating circumstances, and that there was no reason to refuse to accept the jury's recommendation of the death penalty.

## II. POST–CONVICTION PROCEDURAL HISTORY

Larry W. Roney was appointed to represent the petitioner on his appeal to the Alabama Court of Criminal Appeals. The only issue raised on appeal was ineffective assistance of counsel, specifically, that the conduct of the petitioner's appointed attorneys reduced his trial to a farce, sham, or mockery of justice. The Court of Criminal Appeals disagreed, and affirmed the petitioner's conviction and sentence on April 20, 1982. Rehearing was denied on May 18, 1982. *See Daniel v. State*, 459 So.2d 933 (Ala.Crim.App.1982).

Roney then filed a petition for writ of certiorari in the Supreme Court of Alabama. Vanzetta Penn Durant also appeared as amicus curiae for Lillie Daniel, the petitioner's mother. They argued that the Court of Criminal Appeals should have granted the petitioner a new trial because of his trial counsel's incompetency, or, in the alternative, an evidentiary hearing to review the competency of his trial counsel.

---

**3.** *Ala.Code* § 13A–5–31(a)(5) (1975) was repealed and replaced with *Ala.Code* § 13A–5–40(a)(5) (1975) (1982 Repl.Vol.) effective July 1, 1981, but only as to conduct occurring after July 1, 1981. *See Ala.Code* § 13A–5–57 (1975) (1982 Repl.Vol.).

On November 5, 1982, the Supreme Court of Alabama remanded the case to the Court of Criminal Appeals with directions to remand the cause to the trial court for an evidentiary hearing on the single issue of the petitioner's challenge of the competency of his appointed trial counsel, and upon review of the trial court's findings of fact, to make a final determination of the competency of counsel. See Ex parte Daniel, 459 So.2d 942 (Ala.1982).

The trial court held the requested evidentiary hearing on June 9, 1983, and filed an order in the Circuit Court of Russell County on November 7, 1983, finding that counsel for the petitioner were competent. Although Roney withdrew from the appellate representation of the petitioner on December 16, 1982, he did represent him at the evidentiary hearing. On return to remand, however, the petitioner was unrepresented by counsel. On January 10, 1984, the Alabama Court of Criminal Appeals affirmed the determination that the petitioner's attorneys rendered effective and proper legal assistance at the trial. An application for rehearing was filed by the court ex mero motu, and denied on March 20, 1984. See Daniel v. State, 459 So.2d 944 (Ala.Crim. App.1984).

On March 22, 1984, James R. McKoon, Jr., was appointed to represent the petitioner. McKoon filed a petition for certiorari in the Supreme Court of Alabama, again asserting only a contention that the petitioner received ineffective assistance of counsel at trial, although he attacked a different aspect of the trial lawyers' representation than had Roney. McKoon contended that trial counsel's failure to move for an independent psychiatric examination constituted ineffective assistance. The Supreme Court of Alabama affirmed the judgment of the Court of Criminal Appeals on August 31, 1984, and rehearing was denied on November 9, 1984. See Ex parte Daniel, 459 So.2d 948 (Ala.1984).

Malcolm R. Newman next undertook the representation of the petitioner on a volun-

tary basis without remuneration pursuant to 18 U.S.C. § 3006A on a referral from the Southern Poverty Law Center/Alabama Capital Case Resource Center. Newman filed a petition for writ of certiorari in the United States Supreme Court, which was denied on April 1, 1985. See Daniel v. Alabama, 471 U.S. 1009, 105 S.Ct. 1878, 85 L.Ed.2d 170 (1985).

Newman then filed, on May 23, 1985, a petition for writ of error coram nobis in the Circuit Court of Russell County, contending that the petitioner's constitutional rights were violated in the following respects: (1) that the death penalty was disproportionate, severe, and excessive punishment in this case; (2) that the death penalty was unjustified as a means for achieving any legitimate governmental end; and (3) that his trial and sentencing hearing were heard by a jury from which persons having conscientious scruples against the death penalty were systematically excluded. The trial court denied the petition on December 10, 1986, holding that because the disproportionality claim was decided against the petitioner on appeal[4] and the other claims were not raised at trial or on direct appeal, all claims raised therein were barred from coram nobis review.

On July 24, 1987, Newman filed a motion for post-conviction sanity hearing and for suspension of sentence, which was denied by the trial court on August 12, 1987. The petitioner's execution was scheduled for December 4, 1987.

On November 24, 1987, Newman sought relief for the petitioner in this court, filing a petition for writ of habeas corpus together with an application for stay of execution. The petition asserted the following grounds for relief: (1) the petitioner's current insanity; and (2) the unconstitutionality of Alabama's post-conviction determination of sanity. Immediately thereafter, the court received a letter from counsel for the respondents, which stated, in pertinent part, as follows:

---

4. In its initial opinion, the Alabama Court of Criminal Appeals stated that it had reviewed the case in light of the standards and procedures announced in Beck v. State, 396 So.2d 645 (Ala. 1980), modified on denial of reh'g, (Ala.1981)

and found "that the crime was properly punishable by death and that the sentence was appropriate in both its relation to the crime and to the appellant." Daniel v. State, 459 So.2d 933, 937 (Ala.Crim.App.1982).

At the punishment stage of petitioner's 1981 capital trial, a Bryce Hospital psychologist, Ed Seger, testified as a witness for the State. Seger testified, in rebuttal to a defense psychologist, that Daniel had been found to be malingering during his evaluation at Bryce and that David [sic] was competent and sane.

In 1986, Seger was dismissed from Bryce Hospital when it was discovered that Seger had falsely represented that he had a doctorate in clinical psychology. Seger was not a qualified clinical psychologist and some of his testimony at Daniel's trial regarding his qualifications was false. Counsel for Respondents first learned of Seger's involvement upon reviewing the transcript of Daniel's trial after receiving the habeas petition.

Following a hearing on the application for stay of execution on December 1, 1987, the court granted the stay without opposition from the respondents. In light of Seger's involvement in the sentencing phase of the trial, the court afforded the petitioner an opportunity to amend his petition.

Newman filed an amended petition for writ of habeas corpus on the petitioner's behalf on January 25, 1988, which added the following grounds for relief: (3) an erroneous charge given to the sentencing jury on aggravation; (4) the state's failure to prove any aggravating factors; (5) the improper testimony of Ed Seger at the sentencing phase of the trial; and (6) ineffective assistance of counsel. The respondents filed an answer to the habeas corpus petition as amended on February 17, 1988, in which they conceded, in paragraph 19, that the petitioner was "entitled to a new punishment stage hearing because of Edwin Seger's testimony at the punishment stage of petitioner's trial."

The respondents also filed, contemporaneously with their response, a motion to compel the petitioner to present all claims concerning the guilt stage of his trial or have them barred, as the amended petition only raised grounds for relief relative to the sentencing phase of the trial. The court held a hearing on the respondents' motion on March 3, 1988, and issued an order on March 9, 1988, directing the petitioner to raise all conceivable grounds for habeas corpus relief concerning his conviction, and notifying him that failure to raise a ground would be deemed a waiver of his right to raise it in the future.

Newman then filed an "Affidavit of Compliance" on April 6, 1988, in which he stated the following:

> Counsel asked Daniel if he knew of any other grounds on which to base the Petition to overturn his conviction as opposed to his sentence. Daniel did not appear to understand the distinction and offered nothing new as a basis for the reversal of his conviction.
>
> The undersigned counsel [Newman] does hereby affirm that he has reviewed the record in this cause and has previously raised all the issues he deemed meritorious regarding the Petitioner's conviction and sentence.

On April 20, 1988, the court granted the petition for writ of habeas corpus as amended,[5] and ordered respondents to conduct a new sentencing hearing for the petitioner within sixty days. The court subsequently granted two motions for extension of time in which the sentencing hearing was to be conducted.

A new lawyer, Sam E. Loftin, was appointed to represent the petitioner at the sentencing hearing. He filed a petition for psychiatric examination on July 28, 1988. An order for a lunacy commission evaluation was issued on September 1, 1988, and the petitioner was admitted to the Taylor Hardin Secure Medical Facility[6] on October

---

**5.** Since the respondents conceded that the petitioner was entitled to a new sentencing hearing in this case because of the participation of Ed Seger in that phase of the trial, the court did not address any of the other grounds for relief raised in his petition for writ of habeas corpus. All of the grounds for relief contained in the amended petition before the court at that time related to the punishment phase of the trial.

**6.** Taylor Hardin Secure Medical Facility is a state-supported forensic psychiatric facility located in Tuscaloosa, Alabama. It now conducts the competency evaluations formerly undertaken at Bryce Hospital.

18, 1988, for evaluation, where he remained until January 9, 1989. All three members of his evaluation team found him to be competent to return to trial at the time of his discharge. They were also of the opinion that there was no evidence of significant mental disease at the time of the offense of which the petitioner was accused.

On March 6, 1989, Bryan A. Stevenson, who currently represents the petitioner, filed on his client's behalf a motion for relief from this court's order of April 20, 1988, in order that the petitioner might raise substantive challenges to his capital conviction on which he had never been heard. Both the petitioner and the respondents filed extensive memorandum briefs in support of and in opposition to the motion. Following a hearing on April 12, 1989, this court issued an order on April 13, 1989, granting the petitioner's motion. Stevenson then filed the amended petition for writ of habeas corpus which is presently pending before this court.

## III. DISCUSSION

The petitioner raises the following grounds in support of his claim for relief: (A) the trial court's failure to hold a competency hearing in 1981; (B) the petitioner's conviction by the use of unconstitutional jury instructions; (C) the ineffective assistance rendered to petitioner by both trial and appellate counsel; (D) the use at trial of an illegally obtained statement; (E) the petitioner's participation in a lineup without consultation with counsel; and (F) the unconstitutional application of the death penalty to the mentally handicapped. The court will address these issues *in seriatim.*

### A. *Whether the trial court was required to hold a competency hearing in 1981*

■ The failure to observe procedures that adequately protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives such a defendant of his due process right to a fair trial. *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). The

petitioner claims that such a failure occurred in this case.

■ The petitioner's mental competence has been questionable since the inception of criminal proceedings against him. His trial lawyers initially considered a defense based upon a plea of not guilty by reason of insanity, and requested that he be evaluated by mental health professionals. When that evaluation was conducted, and the petitioner was diagnosed as malingering, his lawyers abandoned the insanity theory and pursued a defense of not guilty. They did not request a competency hearing. The petitioner claims that even in the absence of such a request from his lawyers, the trial court was required, pursuant to *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), to hold a competency hearing on its own motion.

In *Pate,* the United States Supreme Court held that when the evidence "raises a *bona fide* doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing...." 383 U.S. at 385, 86 S.Ct. at 842. The respondents argue that the evidence before the trial court in 1981 was insufficient to raise a *bona fide* doubt regarding the petitioner's competence. The Eleventh Circuit discussed the necessary elements for the evaluation of a *Pate* claim in *Fallada v. Dugger,* 819 F.2d 1564 (11th Cir.1987).

> To determine whether a *Pate* violation has occurred, a court should consider three factors: (1) evidence of the defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competence to stand trial. A *Pate* analysis must focus on what the trial court did in light of what it then knew, whether objective facts known to the trial court were sufficient to raise a bona fide doubt as to the defendant's competency.

819 F.2d at 1568 (citations omitted). If the facts known to the trial court in 1981 raised a reasonable ground to doubt petitioner's competence, then the court was required by Alabama law [7] to impanel a

---

7. *Ala.Code* § 15–16–21 (1975).

jury to conduct a competency hearing. *Demos v. Johnson*, 835 F.2d 840, 843 (11th Cir.), *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988); *cf. Pate*, 383 U.S. at 385, 86 S.Ct. at 842 (same procedural requirement pursuant to Illinois law if there is a *bona fide* doubt).

### 1. Pate violation factors

#### a. *Evidence of the petitioner's irrational behavior*

Dr. Rose's report indicates that interviews with friends and family members of the petitioner in Houston, Texas, revealed that he began acting strangely following an automobile accident in December of 1980. Dr. Rose stated:

> Following this he was said to have become despondent and to have spent much time sitting and staring. He was reported to have called his fiance [sic] a "witch" and to have expressed the belief that someone had poisoned some apples which he had eaten. On one occasion he became agitated and ran naked from the apartment. Family members reported that these behaviors were not known to have been associated with alcohol or drug use.

(Tr. at 469.) The petitioner's fiancee also reported that for a time he would not leave the apartment they shared because of fears that someone would "get him," nor did he want her to leave. The change in his behavior led ultimately to his leaving his fiancee to move in with a brother and sister-in-law who also lived in Houston. The petitioner left Texas without notifying friends or family, and without picking up a paycheck waiting for him at his place of employment.

The petitioner reportedly had a good relationship with his mother, telephoning her every two weeks or so during the time he lived in Houston. In January of 1981, however, she had not heard from him in several weeks, and although his bus from Texas stopped in Montgomery, Alabama, where his mother lived, the petitioner did not contact her. Instead, he continued on to Union Springs, and ultimately arrived in Hurtsboro. On the day of the shooting, numerous witnesses reported seeing him wandering aimlessly in town, behaving strangely, and entering various homes to ask for shelter. After the shooting, when the petitioner's mother and sister came to visit him in jail, they reported that he did not recognize them.

Personnel at the Russell County jail reported antisocial and bizarre behavior during his incarceration. Interviews conducted by Bryce Hospital and Taylor Hardin Secure Medical Facility indicate that he had periods of ranting and raving which alternated with periods of withdrawal, that he spit on people from his cell and openly masturbated in front of visitors, and that he had eaten feces on at least one occasion.

The petitioner's lawyers both questioned his competence from the beginning of their representation of him through the trial. An interview with King conducted by Bryce Hospital personnel states as follows:

> Mr. King reported that he has spoken with George Daniel several times. He stated that after the first conversation with George he thought that George was "conning him." However, he stated that the more he spoke with George the more convinced he became "that George did not know anything" and that "he is crazy." Mr. King reported that George will enter the room and began [sic] looking under items in the room, "will pace like a tiger in a cage" and put his finger in his mouth. Mr. King also reported that George's concept of time appears to him to be confused. He reported that George is unable to determine the length of time that he has spent in jail.

Bryce Hospital Report (Respondents' Exhibit 1 at November 16, 1989, Hearing). At the evidentiary hearing on trial counsel's effectiveness, the following exchange occurred:

> Q [Roney] Based on the facts in this case as you knew them from the beginning of his trip in Houston, Texas, until this tragic incident occurred in Hurtsboro, ... did you think that Mr. George Daniel was acting as a reasonable person or a person in control of all of his mental capacity at the time this particular alleged incident occurred?
>
> A [King] No, sir, I don't.

(Supp.Tr. at 24.) Bernard's testimony at the evidentiary hearing, when asked about the decision not to have the petitioner testify, reflects the following:

> It was my opinion that George was not competent to testify.... I had talked with George many times in his cell—and when I say "his cell," I mean down in the jail—and in my opinion he was not rational. When I say "rational," some of the things that he said did not relate to the question that I had asked him.
>
> I would ask him, you know, perhaps read 3 or 4 lines for me or perhaps ask him where he was from or his birth date or his mother's name and some of the things he could answer and some of the things he could not answer. So, based upon that, and not being able to ascertain what he would say if asked a particular question, I felt like he was not competent to testify.

(Supp.Tr. at 49.)

> I have just one final statement in closing. It is still my opinion that Mr. Daniel was not competent at that time to stand trial nor is he competent to stand trial now but I do believe in the interest of justice Mr. Daniel is entitled to another trial.

(Supp.Tr. at 67.) The record only reflects two instances, however, when either attorney ever communicated these opinions to the trial court. They filed formal requests for psychiatric examination, as has been previously discussed, and there was an exchange between Bernard and the trial court when the petitioner was sentenced, wherein Bernard stated:

> Your Honor, for the record there are still some questions as to the mental capacity of the defendant; take notice that the defendant has appointed counsel and did not have funds to hire their own independent psychiatrist....

(Tr. at 425.)

b. *The petitioner's demeanor at trial*

The only indication in the record of the petitioner's behavior during the trial is provided by the testimony of Bernard at the evidentiary hearing. He stated:

> The whole time we had the trial he had a cup—he went and got him a cup and he kept spitting and spitting.

(Supp.Tr. at 49.) The record also reflects that the petitioner talked very little with his attorneys during the trial, if at all.

c. *Medical opinions regarding the petitioner's competence to stand trial*

The trial court initially sent the petitioner for evaluation to the East Alabama Mental Health Center, where he was seen by Dr. Rose. That report states, in pertinent part, as follows:

> Mr. Daniel reported that on the night of the incident a bus driver dropped him off in Hurtsboro then law officers arrested him. He denied having shot anyone or even having seen the victim. He said he was arrested because he was in the area at the time. Further questioning revealed several factors which may have a bearing on his capacity to stand trial: (a) He expressed no confidence in his attorneys, (b) He appeared to understand legal strategy, including the concept of plea bargaining, but stated he would [not], for example, agree to a guilty plea even if his charge were reduced to "disorderly conduct" because he was *not* guilty and his conduct is "OK". (c) He appeared to lack comprehension of other relevant facts. He voiced the belief that his murder charge is a misdemeanor for which he could receive a maximum sentence of two months. He showed a poor and inaccurate understanding of the roles various parties play in a trial, and it is uncertain whether he could acquire this understanding even with instruction.

> \* \* \* \* \* \*

> *Intellectual Factors*
>
> On formal intellectual tasks Mr. Daniel's performance was below that of a typical high school graduate. His scores fell within the Mild Mental Retardation range. This is not considered to be an accurate reflection of his true intellectual potential, but is believed to reflect intellectual inefficiency due to disordered thought processes. Test results suggest that neurological impairment may be a contributing factor.

*Personality Factors*

At the time of evaluation Mr. Daniel did not appear to be experiencing severe anxiety or depression. He was not hostile or uncooperative. The most outstanding feature of his personality appeared to be his poor contact with reality. He exhibited significant difficulties in comprehending and responding appropriately to simple verbal material. His thinking lacked logical progression and he appeared to frequently respond more to private, idiosyncratic thoughts than to objective stimuli. His emotional guardedness and indifference may also have interferred [sic] with full utilization and/or expression of his thoughts and personality.

*Summary and Conclusions*

Mr. Daniel is a 24 year old male who is reported to have exhibited no unusual behaviors prior to December of 1980. He currently exhibits thinking which is tangential, idiosyncratic, and bizzare [sic]. According to his report and that of his family, his psychological condition does not appear to be drug or alcohol related. In addition to poor reality contact and impaired intellectual ability, he exhibits other attitudes and knowledge deficits which may adversely affect his ability to assist counsel on his own behalf.

*Recommendation*

It is recommended that Mr. Daniel be admitted to a state mental hospital for observation and further evaluation, including a full neurological examination.

(Tr. at 468–69.)

Pursuant to Dr. Rose's recommendation, the petitioner was admitted to Bryce Hospital for further evaluation. The court notes that the recommended neurological examination was not included as a part of the evaluation performed at Bryce.[8] The report from Bryce submitted to the trial court states, in pertinent part, as follows:

The mental status examinations revealed diagnoses of Axis I, Malingering,[9] V65.-20; Axis II, No Diagnosis, V71.09; and Axis III, None.

The psychological assessment revealed that George Daniel made no real effort toward completing any of the psychological testing instruments. Mr. Daniel attempted to mislead the examiner on IQ measures and on Sentence Completions. In the examiner's opinion, Mr. Daniel was malingering at the time of the psychological testing.

Since Mr. Daniel's admission to Bryce State Hospital, he has been under the close observation, evaluation and review of qualified medical, psychiatric, psychological, and other evaluation and treatment staff. The most recent review was on Tuesday, September 1, 1981, and at that time, the Forensic Evaluation and Treatment Board was of the following opinions:

(1) George Daniel is presently competent to stand trial and to assist his attorney in preparing his defense. Mr. Daniel does understand the nature of the charge against him.

(2) George Daniel's alleged criminal conduct is not viewed as the product of mental illness. Therefore, George Daniel was not suffering from such a mental disease, defect, or derangement at the time of the particular act charged which prevented him from possessing the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

(3) George Daniel was not suffering from a mental illness at the time of the particular act charged which prevented him from distinguishing right from wrong or prevented him from adhering to the right.

(Tr. at 480–81.)

2. Pate analysis

■ The petitioner contends that the evidence before the trial court of irrational

---

8. The petitioner has never received a complete neurological workup, which has been recommended on more than one occasion.

9. The American Psychiatric Association states that the "essential feature of Malingering is intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as ... evading criminal prosecution...." American Psychiatric Asso., *Diagnostic and Statistical Manual of Mental Disorders* 360 (3d ed. rev. 1987).

behavior on the petitioner's part in late 1980 and early 1981, together with Dr. Rose's report, raised sufficient doubts about his competency to require a *Pate* hearing. In light of the Bryce report that was also before the trial court, this court does not agree. The trial court followed Dr. Rose's recommendation that the petitioner be evaluated further and sent him to Bryce, where he was diagnosed as malingering. This court is of the opinion that any further unusual behavior by the petitioner could reasonably have been viewed by the trial court as additional attempts by the petitioner to misrepresent his mental status. The Bryce report specifically concluded that the petitioner was competent to stand trial, and the record presents no evidence during trial of anything that would warrant further inquiry by the trial court into his competency. Although the petitioner was apparently quite passive during the trial, and continuously spat into a cup, this court is of the opinion that his demeanor at trial was not so unusual or deviant that it should have raised a *bona fide* doubt on the part of the trial court that would have required it to conduct a *Pate* hearing. *See Fallada*, 819 F.2d at 1569; *Thomas v. Kemp*, 796 F.2d 1322, 1326 (11th Cir.), *cert. denied*, 479 U.S. 996, 107 S.Ct. 602, 93 L.Ed.2d 601 (1986).

This court also disagrees with the petitioner's contention that Seger's participation in the Bryce report rendered it invalid. A *Pate* inquiry focuses on what was known to the trial court at the time. *Thomas*, 796 F.2d at 1326. There was nothing before the trial court in 1981 to indicate that Seger was anything other that what he claimed to be. Furthermore, he was the third Bryce staff member to examine the petitioner, confirming a diagnosis already rendered by both a legitimate psychiatrist and psychometrician. This court is of the opinion that the trial court justifiably relied on the Bryce report despite Seger's involvement with it.

After evaluating the record in light of the factors set out above, this court is of the opinion that there was no *Pate* violation in the petitioner's trial in 1981, and that he is not entitled to habeas relief on that ground.

B. *Whether the trial court's jury instructions were unconstitutional*

 Due process requires that a jury in a capital case be charged on lesser included offenses when the evidence warrants it. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In *Beck*, the United States Supreme Court held as follows:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake.... Thus, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case.

447 U.S. at 637–38, 100 S.Ct. at 2389–90 (footnote omitted). As long as there is a possibility of a death sentence, a defendant has an unequivocal constitutional right to have the jury instructed regarding relevant lesser included offenses. *Rembert v. Dugger*, 842 F.2d 301, 303 (11th Cir.), *cert. denied*, 488 U.S. 969, 109 S.Ct. 500, 102 L.Ed.2d 536 (1988).

1. Whether there was a Beck violation

 The petitioner claims that he is entitled to a new trial because the trial court did not charge the jury in 1981 regarding lesser included offenses. The respondents argue that a lesser included offense charge was given as to murder and, therefore, that the petitioner is not entitled to relief. In the opinion of this court, the jury instructions in this case were violative of *Beck*.

The trial court stated initially in its charge to the jury that the capital felony "includes in it a lesser charge. That lesser charge is the offense of murder, which is not a capital offense...." (Tr. at 303.) Later in the charge, the court gave the jury

the following "definition of capital murder:"

> The crime of murder is committed by a person if that person causes the death of another person and ... he intended to kill that person.... Or a person commits the crime of murder if under circumstances in which he manifests extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person ... and thereby causes the death of another.

(Tr. at 308.) The court then told the jury that murder had been defined, which was "a lesser and included offense," and that "it would be a capital murder, if in addition to those [elements] the party *intentionally killed* was an officer in the line of his duty...." (Tr. at 308 (emphasis added).) The respondents contend that the inclusion of the phrase "intentionally killed" was sufficient to satisfy the requirements of *Beck* in this case, because if the jury had found that the petitioner did not intend to kill Officer Claypool, it could have found that he acted with "extreme indifference to human life."

In the opinion of this court, the foregoing portion of the jury charge is confusing at best. It cannot survive constitutional muster, however, in light of the remainder of the charge. One sentence later, the trial court stated that murder "is capital under the other circumstance *when the person killed is an officer of the law in the official performance of his official duty.*" (Tr. at 308 (emphasis added).) The court then discussed the elements that the state was required to prove beyond a reasonable doubt as follows:

> One, they must prove that George L. Claypool is dead. Second, they must prove that the defendant ... caused the death ... and that [Claypool] died as a result of the act of the defendant in shooting him with the pistol. Third, ... that the defendant acted with the intent to kill ... *or that under circumstances showing extreme indifference to human life, the defendant acted recklessly ...* and in fact caused the death of George L. Claypool. Those are the elements that must be proved for murder.
>
> [T]hose same elements must be proven with one other element to make it capital murder. That other element is that ... Claypool *was on duty or because of his performance of his official duty, he was killed.* That would make it capital murder.

(Tr. at 308–08A (emphasis added).) The foregoing instructions effectively gave the jury only two options, the verdict form for murder notwithstanding. If the jury found that the petitioner had caused the death of an officer on duty, whether intentionally or recklessly, it was instructed to find the petitioner guilty of capital murder. It could have also found him not guilty.

Pursuant to Alabama law, a capital offense is an intentional murder, not a murder as a result of extreme indifference to human life.[10] The law applicable to the petitioner's conduct, *Ala. Code* § 13A–5–31 (1975) (Supp.1979), defined the following as a capital offense:

> (a) If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses:
>
> \* \* \* \* \* \*
>
> (5) The murder of any police officer, sheriff, deputy, state trooper or peace officer of any kind, or prison or jail guard while such prison or jail guard is on duty or because of some official or job-related act or performance of such officer or guard.

Section 13A–5–31(a) was identical to § 13–11–2(a), the statute considered by the

---

10. The following definitions of murder are provided in *Ala. Code* § 13A–6–2 (1975):

> (a) A person commits the crime of murder if:
> (1) With intent to cause the death of another person, he causes the death of that person or of another person; or
> (2) Under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person.

United States Supreme Court in *Beck v. Alabama,* 447 U.S. at 627–28, 100 S.Ct. at 2384–85, wherein the preclusion clause was held unconstitutional. Upon remand of that case to the Supreme Court of Alabama, the court struck from the statute the words "and which offenses so charged with said aggravation shall not include any lesser offenses" and upheld the remainder of the statute.

> [W]e conclude that severance of the preclusion clause will not leave the remainder of the statute meaningless, because without preclusion, the Alabama rule concerning lesser included offenses will apply so that juries in capital cases will be instructed on *each lesser included offense which has any basis in the evidence.* As we noted previously, that is the rule which applies in every state in this country and in the federal courts, and will henceforth be the rule in Alabama in capital cases.

*Beck v. State,* 396 So.2d 645, 658–59 (Ala. 1980), *modified on denial of reh'g,* (Ala. 1981) (emphasis added).[11] *Beck v. State* also explicitly stated the following regarding the intentional nature of capital murder:

> The Alabama legislature has substantially followed the Model Penal Code in describing with specificity those offenses which are deemed capital offenses. Code 1975, § 13A–5–31. Each of the fourteen crimes specified requires an *intentional killing* with aggravation, and not some crime other than homicide under aggravated circumstances.

*396* So.2d at 661–62 (emphasis in original). The holdings of *Beck v. State* were codified in *Ala.Code* § 13A–5–40, the statute which replaced § 13A–5–31.

The jury charges given by the trial court in the petitioner's case did not adequately explain the requisite intentional nature of a capital offense. The inclusion of the "ex-treme indifference to human life" definition of § 13A–6–2(a)(2) as an apparent alternative definition of murder gives the impression that a "reckless" murder can be considered a capital murder. Noncapital murder is never adequately defined or addressed as a separate charge. Furthermore, *Beck v. State* mandates a charge on every lesser included offense that has any evidentiary basis. There is no instruction whatsoever in the jury charges that would have given the jury the option of finding the petitioner guilty of manslaughter.[12]

This court is of the opinion that the evidence presented during the petitioner's trial required that the jury have more options than capital murder or not guilty. Evidence was presented from which the jury could have determined, for example, that the officer's death was not intended by the petitioner, but occurred during a struggle for the officer's gun while the two men were fighting in the ditch. In any event, the evidence did not show that the petitioner set out to kill Officer Claypool. This court recognizes that the absence of a planned murder does not make Officer Claypool's death any less tragic, but the jury should have been allowed the option of finding that the circumstances of the petitioner's crime were less egregious that those of the majority of death penalty cases.

2. Whether the petitioner's Beck claim is barred by procedural default

The respondents contend that even if this court finds that there was a *Beck* violation in the 1981 trial, the petitioner is not entitled to relief because his claim is barred by procedural default. It is well established that "[a] defendant who is procedurally barred from raising a federal constitutional claim in state court is also barred from raising the claim in a federal habeas peti-

---

11. Rehearing was denied in *Beck v. State,* 396 So.2d at 645, in March of 1981, several months before the petitioner's trial.

12. *Ala.Code* § 13A–6–3 states:
 (a) A person commits the crime of manslaughter if:
 (1) He recklessly causes the death of another person, or

(2) He causes the death of another person under circumstances that would constitute murder under section 13A–6–2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.

tion unless he can show cause for and actual prejudice from making the default." *Pelmer v. White,* 877 F.2d 1518, 1520 (11th Cir.1989) (quoting *Gates v. Zant,* 863 F.2d 1492, 1500 (11th Cir.1989)); *accord Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■■■■ Pursuant to Alabama law, the failure to raise an issue either at trial or on direct appeal constitutes a procedural bar to the assertion of that issue in a subsequent collateral proceeding. *Pelmer,* 877 F.2d at 1521. There is no doubt that no issues regarding the jury charges in the instant case were raised at trial or on appeal. The petitioner's trial attorneys proposed but one jury charge; they made no objections to any charges given.[13] The petitioner's appellate attorneys raised only the issue of ineffective assistance of counsel.[14] The petitioner argues here that he is nevertheless entitled to relief on this ground because Alabama does not consistently enforce its procedural default rules. A state procedural rule is not entitled to deference by a federal habeas court if the rule is not "strictly or regularly followed." *Hathorn v. Lovorn,* 457 U.S. 255, 263, 102 S.Ct. 2421, 2426, 72 L.Ed.2d 824 (1982).

The petitioner cites numerous cases to this court in which the Supreme Court of Alabama reviewed a *Beck* violation for the first time. With one exception, *Ex parte Kennedy,* 472 So.2d 1106 (Ala.1985), *aff'g Kennedy v. State,* 472 So.2d 1092 (Ala. Crim.App.1984), *cert. denied,* 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985), the Alabama court was reviewing convictions obtained before the United States Supreme Court rendered its decision in *Beck.* In *Kennedy,* the defendant's lawyer had objected at trial to the court's refusal to give a lesser included offense charge. *See Kennedy v. State,* 472 So.2d at 1100, 1102.

That issue was raised on appeal; it was not raised in the petition for certiorari, but was raised on application for rehearing. The Alabama court addressed the *Beck* claim on rehearing because Kennedy was convicted of a capital crime. *See Ex parte Kennedy,* 472 So.2d at 1113–14. This court declines to hold, based on its research, that Alabama does not consistently follow its procedural default rules relative to jury charges in general and *Beck* violations in particular. The court notes that two other federal courts, in reviewing capital cases from the State of Alabama in which errors in jury instructions were claimed, have held those claims barred from habeas review on the basis of procedural default. *See Richardson v. Johnson,* 864 F.2d 1536, 1539–40 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3175, 104 L.Ed.2d 1037 (1989); *Ritter v. Smith,* 568 F.Supp. 1499, 1518 (S.D.Ala. 1983), *rev. in part on other grounds,* 726 F.2d 1505 (11th Cir.), *cert. denied,* 469 U.S. 869, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984). *"Engle v. Isaac, supra* [456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)], and related decisions establish that petitioner's state law procedural default bars him from litigating any jury instruction issues in this Court absent an affirmative showing of both cause and prejudice." *Ritter,* 568 F.Supp. at 1518.

The petitioner may nevertheless obtain collateral relief based on a trial error to which no contemporaneous objection was made if he can show both cause for his procedural default and actual prejudice from the error of which he complains. *United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982).

a. *Cause for the procedural default*

Because of the wide variety of contexts in which a procedural default can occur,

---

**13.** The court notes that Rule 45A, *Ala.R.App.P.,* provides that in death penalty cases, the Alabama Court of Criminal Appeals "shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court...." Furthermore, Rule 39(k), *Ala.R.App.P.,* provides that upon review on certiorari of opinions of the Court of Criminal Appeals in death penalty cases, the Supreme Court of Alabama "may notice any plain error or defect in the proceeding under

review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner."

**14.** In its initial review, the Alabama Court of Criminal Appeals stated: "We have also searched the record for any other error and have found none." *Daniel v. State,* 459 So.2d at 938.

the Supreme Court "has not given the term 'cause' precise content." *Reed v. Ross*, 468 U.S. 1, 13, 104 S.Ct. 2901, 2909, 82 L.Ed.2d 1 (1984). The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to the petitioner. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986). *Harmon v. Barton*, 894 F.2d 1268, 1274–75 (11th Cir.1990). The petitioner argues that his claims of ineffective assistance of counsel constitute cause for the procedural default in this case.

█ Attorney error does not automatically establish sufficient cause to enable the petitioner to avoid procedural default. *Richardson*, 864 F.2d at 1539. If the petitioner prevails on his ineffective assistance of counsel claim, however, he may have grounds on which to claim cause for his procedural default. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986); *Pelmer*, 877 F.2d at 1521–22.

> [I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not "conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance." Ineffective assistance of counsel, then, is cause for a procedural default. However, we think that the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.

*Carrier*, 477 U.S. at 488–89, 106 S.Ct. at 2645–46 (citations omitted). The Supreme Court further indicated in *Carrier* that "the right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error of counsel. . . ." 477 U.S. at 496, 106 S.Ct. at 2649; *see also United States v. Cronic*, 466 U.S. 648, 657 n. 20, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984).

█ Because this court is of the opinion that the petitioner did not have the benefit of effective assistance of counsel at either the trial or appellate level, as will be discussed hereinafter, and because his claim of ineffective assistance was presented to the state courts, in the opinion of this court, the petitioner has established cause for his procedural default.

### b. *Actual prejudice from the erroneous jury instructions*

█ In *United States v. Frady*, the United States Supreme Court summarized the requisite degree of prejudice by stating that, before a habeas petitioner can obtain collateral relief for errors in a jury charge, he must show " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " 456 U.S. at 169, 102 S.Ct. at 1595 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977)) (citations omitted). The Court in *Frady* went on to hold as follows:

> We reaffirm this formulation, which requires that the degree of prejudice resulting from instruction error be evaluated in the total context of the events at trial. As we have often emphasized: "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Moreover, "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction."

> * * * * * *

> . . . [Frady] must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual*

and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.

456 U.S. at 169–70, 102 S.Ct. at 1595–96 (citations omitted) (emphasis in original).

In the opinion of this court, the resulting actual prejudice to the petitioner as a result of the unconstitutional jury instructions is obvious. Lesser included offense instructions provide a crucial procedural safeguard to defendants charged with capital offenses. *Beck,* 447 U.S. at 637, 100 S.Ct. at 2389. The evidence presented at the petitioner's trial clearly indicated that the victim of murder was a police officer who was on duty at the time and that the petitioner was involved in his death. The erroneous instructions presented the jury with the alternatives of either punishing the petitioner to the greatest extent allowed by law or not punishing him at all. Other alternatives may have been appropriate; their unavailability infected the petitioner's trial with "error of constitutional dimensions."

There could be no greater prejudice to the petitioner than being sentenced to death when a properly instructed jury may well have imposed a different sentence. The United States Supreme Court has often emphasized the significant constitutional difference between the death penalty and lesser punishments. As the Supreme Court stated in *Beck:*

"[D]eath is a different kind of punishment from any other which may be imposed in this country.... From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 357–358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (opinion of Stevens, J.).

To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination.

447 U.S. at 637–38, 100 S.Ct. at 2389–90 (footnote omitted).

#### 3. Other challenged jury instructions

The petitioner also contends that the trial court should have instructed the jury that the petitioner had knowledge that the victim was a police officer and that the malice charge was erroneous. This court finds no merit to either contention.

### C. *Whether the petitioner received effective assistance of counsel*

The foremost standard by which ineffective assistance of counsel claims are to be evaluated was promulgated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), wherein the Court held as follows:

In giving meaning to the [constitutional] requirement [of effective assistance of counsel], ... we must take its purpose—to ensure a fair trial—as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

 \* \* \* \* \* \*

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said

that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 686–87, 104 S.Ct. at 2064.

In *Strickland*'s companion case, *United States v. Cronic,* the Court emphasized the importance of the adversarial process.

> The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.... "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators."

466 U.S. at 656–57, 104 S.Ct. at 2045–46 (citations omitted) (footnotes omitted).

*Cronic* represents a narrow exception to the general rule that a habeas petitioner who claims ineffective assistance of counsel must demonstrate prejudice by errors in counsel's performance. *Harding v. Davis,* 878 F.2d 1341, 1345 (11th Cir.1989). The exception applies in two circumstances only. The first occurs when an accused is denied counsel totally or at a critical stage of the trial. *Cronic,* 466 U.S. at 659 & n. 25, 104 S.Ct. at 2047 & n. 25; *Harding,* 878 F.2d at 1345. Complete denial of counsel is not applicable here. However, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047; *Harding,* 878 F.2d at 1345. "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic,* 466 U.S. at 659, n. 26, 104 S.Ct. at 2047, n. 26.

▮▮▮ The performance of the petitioner's trial attorneys has been reviewed by the Alabama appellate courts and found effective. This court is not bound by that determination, however. As the United States Supreme Court has stated, "in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court...." *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. The performance of the petitioner's appellate attorneys has not yet been subjected to judicial review. In evaluating the petitioner's attorneys, the duty of a federal court which is reviewing a state court proceeding "is not to grade counsel's performance," but instead, the "ultimate focus" of the inquiry "must be on the fundamental fairness of the proceeding whose result is being challenged." *Bertolotti v. Dugger,* 883 F.2d 1503, 1510 (11th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990) (quoting *Strickland,* 466 U.S. at 696–97, 104 S.Ct. at 2069–70).

1. Whether trial counsel rendered ineffective assistance

The petitioner claims that his trial lawyers were deficient in the following ways: (1) rejection of an insanity defense; (2) failure to further investigate the petitioner's mental health, particularly the failure to request the appointment of an independent psychiatrist and a competency hearing; (3) destruction of evidence relating to the petitioner's mental problems; (4) failure to conduct meaningful pre-trial litigation and lack of preparation; (5) inadequate performance during trial, including the failure to object to the jury charges; and (6) the existence of a conflict between the two lawyers.[15] The respondents argue that

---

**15.** The petitioner also contends that the involvement of Seger in the preparation of the Bryce report, upon which trial counsel relied, constituted state action that deprived him of effective assistance. Since this court has already stated its opinion that Seger's part in the petitioner's evaluation did not render the report invalid, it need not address the petitioner's argument relative to this issue as it applies to the effective assistance of counsel claim.

none of the alleged errors were so serious that they constituted ineffective assistance of counsel.

In *Stano v. Dugger*, 889 F.2d 962 (11th Cir.1989), *reh'g en banc granted and opinion vacated*, 897 F.2d 1067 (11th Cir.1990), the United States Court of Appeals for the Eleventh Circuit discussed the application of both *Strickland* and *Cronic* to ineffective assistance claims.

[A] petitioner can obtain relief from ineffective assistance of counsel if petitioner was prejudiced by serious deficiencies in counsel's performance. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "In some cases," moreover, the Supreme Court has held that "the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided." *United States v. Cronic*, 466 U.S. 648, 654 & n. 11, 104 S.Ct. 2039, 2044 & n. 11, 80 L.Ed.2d 657 (1984) (quoting *United States v. Decoster*, 624 F.2d 196, 219 [ (D.C.Cir.1976) ] (en banc) (MacKinnon, J., concurring), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979)); *see Penson v. Ohio*, 488 U.S. 75, ——, 109 S.Ct. 346, 353–54, 102 L.Ed.2d 300 (1988). Whereas the ineffective-assistance-of-counsel analysis under *Strickland* focuses on counsel's actual performance at trial, *Strickland*, 466 U.S. at 686–87, 104 S.Ct. at 2064, the analysis under *Cronic* looks to "the circumstances surrounding [counsel's] representation," *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046.

889 F.2d at 964. This court will review the petitioner's claims of ineffective assistance of counsel pursuant to both standards.

A review of the actions of the petitioner's attorneys is first in order.

The matter of the petitioner's competency was at issue, as has been previously discussed. After their client had been evaluated and the Bryce report was received, trial counsel testified that they made a strategic decision to abandon any insanity defense. This court does not find their reliance on the Bryce report to be unreasonable, but notes that there was testimony at the evidentiary hearing that their abandonment of the insanity defense was based, at least in part, on their personal dislike of that theory of defense. King testified as follows:

I am a lawyer who personally don't [sic] think that the defense of insanity is as great as some other lawyers think and I have a right as an attorney in this case to use my opinion as to what defenses to use. We have a situation here and this has nothing to do with a [sic] race because it doesn't make any difference whether it is a black man or a white man, when you have a policeman that has been murdered, you are just not going to sell the idea to a jury.

(Supp.Tr. at 21–22.) Bernard testified as follows:

I was of the opinion that if you said not guilty by reason on [sic] insanity, that in effect you are saying that he is guilty but he was crazy when he did it. I didn't subscribe to that.

(Supp.Tr. at 52–53.)

Despite the Bryce report, both lawyers still believed that the petitioner was not competent. They never requested a competency hearing, nor did they request an independent psychiatric examination even though they thought such expert assistance would have been beneficial. Bernard's testimony at the evidentiary hearing reflects the reasoning for that decision.

Q [Roney]: Did you ever seek to file any type of motion with the court to require George to be examined by an independent psychiatrist to determine whether he was insane?

A: I did not ask for funds from the court for this reason: First of all, Mrs. Daniels [sic] had hired an attorney and it was my opinion that if you hire an attorney, that the State is not responsible to provide the funds for you to hire an independent psychiatrist. I think that both Mr. King and I agreed that we needed our own private psychiatrist but we also agreed that they didn't have the funds for this.

(Supp.Tr. at 53.)

Q [Roney]: [Y]ou indicated that you had discussed the fact that you probably needed a private psychiatrist with Mr.

King for an examination so that you might have this witness at trial. Was the lack of funds the reason that this was not done?

A: In my opinion, yes.

Q: In your opinion did you feel that this should have been done?

A: I think it would have helped quite a bit.

(Supp.Tr. at 62.)

One of the basic duties discussed in *Strickland* is the duty to discuss important decisions with the client. As a result of either the petitioner's inability to communicate with his lawyers or their continued doubts about his mental competence, the petitioner's lawyers consulted with him very little during the trial, if at all, as is reflected by the following testimony at the evidentiary hearing:

Q [Estes]:[16] Mr. King, at the time of the trial of this cause, after the State rested, didyou [sic] and Mr. Bernard consult with Mr. Daniel to determine whether or not he wished to testify?

A [King]: No, we did not, not that I remember, because we felt like that it was in his best interest not to testify.

\*　　\*　,\*　　\*　　\*　　\*

Although we did not use the defense of insanity as the main defense, but for us to have started consulting with the defendant at that time and starting to ask him questions about how to conduct the trial—You know people sitting on the jury are not dumb-bunnies. They are a cross-section of this community and they see everything and if we had started talking to Mr. Daniel over there, you know, although we didn't get into the defense of insanity very much, every witness and particularly those witnesses from Bryce, we cross-examined them as to the competency of Mr. Daniel.[17] It

was still in the minds of the jurors there that the man could have been insane.

(Supp.Tr. at 10–11.)

Q [Roney]: [Y]ou did not ask Mr. Daniel whether or not he wished to take the stand and wished to testify?

A [King]: No, sir, we did not.

\*　　\*　　\*　　\*　　\*　　\*

Q [Roney]: All right, why didn't you?

A [King]: Because first of all, although we had not presented any evidence as to his sanity or insanity, on cross-examination we still went into the question about whether or not they thought that George Daniel was insane or not. We still had that before the jury and if we turn around and started talking to a man who was supposedly insane and asking his opinion, I don't think it would have helped our case.

(Supp.Tr. at 17.)

[Bernard]: The question was asked whether we should discuss this with George as to whether he should testify or not. That has been almost 2 years and I cannot say to a certainty that we asked George whether he wanted to testify or not. George was at the table and if we did not ask him—George was sitting beside me and I am certain I told him what the intentions were. What I mean by that is that I said, "We will not call you to testify and this is the reason why. Do you have any questions or objections?" To the best of my recollection I received neither a yea or nay on that, so we proceeded there.

(Supp.Tr. at 49–50.)

Q [Roney]: You are saying under oath today that in your opinion you didn't think he was mentally capable of taking the stand in his own behalf; is that correct?

A [Bernard]: That was my opinion and is still my opinion.

---

**16.** Thomas Estes, Chief Deputy District Attorney, represented the state at the evidentiary hearing on the ineffective assistance of counsel claim ordered by the Supreme Court of Alabama.

**17.** The trial transcript reflects only one witness from Bryce, Ed Seger. The petitioner's lawyers did ask some questions of other witnesses regarding their opinion about the petitioner's behavior on the day of the murder and his ability to communicate.

(Supp.Tr. at 53.) Bernard's testimony also reflects his opinion that, even at trial, his client was not competent, but neither he nor King ever attempted to have the petitioner reevaluated.

One thing King did do in furtherance of an incompetency theory was to obtain the petitioner's last paycheck. The petitioner's mother thought that he planned to use it as evidence that "no man in his right mind would work and leave his check, would leave without going by where he worked at and pick up the check." (Supp.Tr. at 36.) Before the trial, however, King endorsed and cashed the check in partial payment of services rendered in representing the petitioner. His testimony reflected the following:

Q [Roney]: What happened to that check?

A: I endorsed the check. It was owed to me and they have been given credit for that.

\* \* \* \* \* \*

Mrs. Daniel owed me and she told me that it was all right for me to use the check.

Q: The purpose of having it sent to you, was that not to be used as evidence that he even left his job out there without picking up his check?

A: Not necessarily. It was a fact but here again we are getting back into the question of what was available to us at the time.

(Supp.Tr. at 28.) The petitioner's mother testified that King did not ask her about cashing the check and applying it to fees she owed to him.

The record indicates little in the way of pretrial preparation by trial counsel. They requested the names of the prosecution's witnesses, and apparently received a copy of the indictment on which the witnesses' names were listed. They attempted no other pretrial discovery. Bernard went to Union Springs to see what happened there; both lawyers went to Hurtsboro to interview witnesses and to attempt to locate others who might be beneficial to the petitioner, but according to their testimony at the evidentiary hearing, much of this work was done shortly before the trial was scheduled to begin.

Q [Roney]: [W]ould you tell the Court what you first did after you were retained to represent Mr. Daniel?

A [King]: The first thing I did was filed a motion with the Court informing the Court that I had been retained.

Q: All right, sir. Then after you filed your motion that you had been retained, what did you do then?

A: I don't know. I mean, the record speaks for itself as to what I did.

(Supp.Tr. at 13.)

[King]: Mr. Bernard and I right on up to the end of this case worked together. And in fact *two or three days before this trial we spent a whole day in Hurtsboro.*

(Supp.Tr. at 16 (emphasis added).)

Q [Roney]: [W]hat was done with regard to preparation for the trial other than what you testified to in regards to meeting with Mr. King in Hurtsboro on the Friday or whatever day it was and discussing the case and going to the scene?

\* \* \* \* \* \*

A [Bernard]: I spent my time—the time that I devoted to the George Daniel's case—I went back to Hurtsboro a couple of times. I went over the whole thing and when I say "the whole thing," I am talking about the location where the gun was found and the house where the people were in. I measured the distance from the police station and things of this nature. I did this in Hurtsboro. I went down there 2 or maybe 3 times before the trial. Now, *this would have been in probably September or October.* I am talking about before I went down there with Mr. King. I did a little reading at the library—the library over in Columbus and I have some books on criminal trial technique. I looked in them. I went to see George a time or two. I cannot recall—I talked with Mr. King on the phone and I can't say how many times but I do recall talking with him a time or two on the telephone. It was not a daily thing.

Q: The only time you actually saw Mr. King, though, prior to the trial was the time you saw him in Hurtsboro prior to the trial; is that correct?

　　*　　*　　*　　*　　*　　*

A: That is correct.

(Supp.Tr. at 54–55 (emphasis added).)

Q [Roney]: Did you discuss any type defense with Mr. King in Hurtsboro prior to the day of trial?

A [Bernard]: When you say did we discuss any type of defense it appears to me like you are asking me did we discuss anything specific. What we did was we discussed what we were going to try and do to protect George Daniel. Now, I don't know if I answered your question or not but we didn't discuss saying we were going to discuss the defense of insanity or self-defense or anything like that. We didn't use those words.

Q: But you just simply discussed the case—what did you do?

A: We discussed it in generalities, you know, like this is what the district attorney's office has; you know, this couldn't have happened here or this could have happened or someone else could have done such and such a thing. Thatis [sic] the way we discussed the case.

(Supp.Tr. at 57–58.) Both lawyers testified that they were unable to locate any witnesses other than those on the state's list who knew anything about the murder or the petitioner. No motions were filed challenging any of the prosecution's evidence, even though objections were made at trial to the admission of some evidentiary items.

Trial counsel interviewed the petitioner's mother and sister, but communication with the family apparently broke down in the weeks before the trial, as the family was at that time attempting to retain another lawyer. In fact, Bernard testified that he did not speak with the Daniel family after June or July until the trial. The petitioner's lawyers testified that they attempted to get his Texas relatives to come for the trial to testify regarding the change in his behavior before he left Houston, but they were not successful in that regard. This court cannot ascertain from the record the extent of the lack of communication that is attrib-

utable to the lawyers' failure to keep the family apprised of the progress of the case, the family's dissatisfaction with the services being provided by the lawyers, or the lawyers' beliefs at various times that they had been dismissed from the case.

At the petitioner's trial, his attorneys cross-examined the prosecution's witnesses, but they put on no evidence of their own. They did challenge the petitioner's identification in a lineup, but admitted his statement into evidence themselves. As this court has already noted, they requested only one jury charge, that handwritten, and made no objections to any of the trial court's charge to the jury. They did call witnesses on the petitioner's behalf at the sentencing hearing in an effort to establish for the jury that the petitioner's mental condition was a mitigating factor to be considered in his favor. They also presented evidence that he had no prior criminal record.

At the close of the sentencing hearing, Bernard, after stating to the trial court that he still questioned the mental capacity of the petitioner, said:

> [T]ake into consideration also that during this particular time that there was a conflict in the desired methods to be used in the defense of the accused and because of this conflict I feel that it worked to the defendant's detriment. Bearing this in mind, we would like for the Court not to impose the death sentence upon the defendant and impose the lesser, life imprisonment.

THE COURT: Do you have anything further to present to the Court?

MR. BERNARD: I think the conflict did a disservice to the defendant; that's all.

(Tr. at 425–26.) The only conflict between the two lawyers that appears in the trial transcript occurred when Seger was called as a witness and they disagreed over whether to stipulate as to his qualifications. At the evidentiary hearing, Bernard also testified that they disagreed over the method of conducting jury voir dire, and that he did not like alternating the cross examination of witnesses. Other portions of the record indicate that there were per-

sonal differences between the two attorneys, together with a disagreement over money that King allegedly agreed to pay to Bernard for his help with the case before the two were appointed by the court, that affected their relationship with each other and may well have affected their ability to work together at the trial.

### a. Whether trial counsel's performance was deficient

■■■ The first prong of the *Strickland* standard requires that the petitioner show that his counsel's alleged errors fell outside the scope of professionally competent assistance. The *Strickland* court stated:

The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance. *In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances....* Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. *The purpose is simply to ensure that criminal defendants receive a fair trial.*

\* \* \* \* \* \*

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, *the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.*

466 U.S. at 688–90, 104 S.Ct. at 2064–66 (emphasis added) (citations omitted). *Strickland* also made it clear that counsel's performance is entitled to deferential judicial scrutiny, and there is a strong presumption that counsel's handling of the case falls within the range of reasonable professional assistance. The defendant must overcome the presumption that the challenged actions "might be considered sound trial strategy." 466 U.S. at 689, 104 S.Ct. at 2065.

Demonstrable errors in this case are plentiful. The personal disagreements between Bernard and King aside, they did little as advocates for their client. Even though both attorneys had questions about the petitioner's ability to assist them with his defense, they kept their doubts to themselves, and despite those doubts, they allowed their personal feelings about the defense of insanity and the use of independent psychiatric assistance to dominate their decisions on the petitioner's behalf in that regard. They had little communication with their client, his family, or each other. Pretrial preparation was sketchy, and although it is quite possible that they were not able to find any witnesses that

the prosecution had not already identified, by waiting months after the crime to visit the area, it is also possible that details were lost that might have helped them in their defense. Their lack of attention to preparation, including research, is nowhere more evident than in their failure to request appropriate jury charges and their failure to object to the clearly unconstitutional charges given by the trial court.

Nevertheless, a *Strickland* analysis must focus on the actual performance at trial of the petitioner's lawyers. *Stano*, 889 F.2d at 964. The respondents are correct when they argue that criminal defendants, even those charged with capital offenses, are not entitled to "error free" representation. This court is of the opinion, however, that the failure of the petitioner's trial counsel to object to the lack of any jury charges regarding lesser included offenses, the failure to object to the improper charges given, and the total failure to present applicable jury charges to the trial court do not constitute reasonable conduct under prevailing professional norms. This case is not one in which the petitioner's lawyers considered and rejected some charges, but not others, as a part of their trial strategy, or objected to some, but not all, of the charges given. They simply were not prepared to deal with the jury charges at all. Sound trial strategy cannot contemplate the abdication of a lawyer's responsibility to participate on his client's behalf in the process of charging the jury, especially in a case wherein the client faces the death penalty. The seriousness of the charges against the petitioner is an appropriate factor that a court may take into consideration when assessing counsel's performance. *Magill v. Dugger*, 824 F.2d 879, 886 (11th Cir.1987).

The Eleventh Circuit has held that *Strickland* "does not preclude a finding of ineffective assistance where the alleged deficient actions or omission centers upon a single incident, if that error is sufficiently egregious and prejudicial." *Chatom v. White*, 858 F.2d 1479, 1485 (11th Cir.1988), *cert. denied*, 489 U.S. 1054, 109 S.Ct. 1316, 103 L.Ed.2d 585 (1989); *see Cronic*, 466 U.S. at 657 n. 20, 104 S.Ct. at 2046 n. 20. Although instances in which a single error

rises to the level of ineffective assistance of counsel are the exceptions to the rule, this court is of the opinion that this case presents such an exception.

b. *Whether the petitioner was prejudiced by trial counsel's performance*

■ The second prong of the *Strickland* standard requires that the petitioner show that he was prejudiced by his trial counsel's deficient performance. The test for prejudice is as follows:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

\* \* \* \* \* \*

When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

466 U.S. at 694–95, 104 S.Ct. at 2068–69.

Lingering doubts about whether a murder was premeditated can be an important factor when jurors consider whether to recommend the death penalty. *Magill*, 824 F.2d at 889. This court is of the opinion that a properly instructed jury, given adequate definitions of and allowed to consider all lesser included offenses, might well have rendered a different verdict. Had those lesser included offense charges been requested of the trial court, or had the charges given been challenged, the trial court would have had an opportunity to discover and correct the erroneous charges given. In the opinion of this court, there is a reasonable probability that jury instructions which were not constitutionally defec-

tive would have caused the factfinder to have a reasonable doubt regarding the petitioner's guilt of *capital* murder. Furthermore, in the opinion of this court, there is a reasonable probability that appropriate jury instructions would have caused the sentencer to conclude that death was not warranted in this case.

### c. *Whether meaningful adversarial testing occurred in this case*

■ This case presents a situation which is different from one in which reasonably competent counsel makes mistakes. Other than their failure to address the jury charges, however, the other errors and omissions of King and Bernard detailed above by this court do not, if considered separately, mandate a finding of ineffective assistance. A *Cronic* analysis allows the court to focus on the totality of the circumstances surrounding counsel's representation in considering whether a true adversarial criminal trial was conducted. *Cronic*, 466 U.S. at 656, 104 S.Ct. at 2045; *Stano*, 889 F.2d at 964.

> If under those circumstances, "the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair," *id.* [*Cronic*, 466 U.S.] at 660–61, 104 S.Ct. at 2048, then ineffectiveness of counsel can be presumed "without inquiry into counsel's actual performance at trial," *id.* at 662, 104 S.Ct. at 2048.

*Stano*, 889 F.2d at 967 (footnote omitted). This court is of the opinion that when the actions of the petitioner's trial lawyers are viewed over the course of the pendency of the criminal charges against the petitioner and his trial, the assistance they rendered cannot be viewed as reasonable considering all the circumstances of this case. The adversarial testing process here failed the petitioner, and he did not receive the fair trial to which all persons facing criminal charges are entitled.

The breakdown of the adversarial testing process in this case is particularly evident upon review of the lawyers' handling of the issue of the petitioner's competence, his ability to assist them with his defense, and the use of independent psychiatric assistance to assist the defense. Although this court agrees with the respondents that,

based upon the facts known to the trial court in 1981, no competency hearing was mandated, serious questions concerning the petitioner's mental status still existed, and were known to his lawyers. The hallmark of a criminal defendant's ability to stand trial is "whether he has sufficient *present* ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (emphasis added). The record before this court indicates that, immediately prior to and during trial, the petitioner either could not consult with his lawyers with any degree of rational understanding, or was not given the opportunity to consult with them because they perceived him to be lacking in the ability to reason with them.

The petitioner's expert witness at the evidentiary hearing conducted by this court on November 16, 1989, James C. Beck, M.D., Ph.D., testified that in his opinion, the petitioner was probably not competent to stand trial, and that the petitioner was presently suffering from a serious mental defect. This opinion was contrary to the opinions expressed by the State of Alabama's psychiatrists and psychologists who saw the petitioner at Bryce Hospital in 1981 and Taylor Hardin Secure Medical Facility in 1988. Dr. Beck's psychiatric evaluation states as follows:

> The history raises reasonable doubt as to the defendant's competency at time of trial. Although it is difficult to reconstruct eight years later, my best guess is that this man had an organic brain syndrome secondary to trauma caused by the auto accident.
>
> The history provided by his family documents a dramatic change in his mental status. The story of his behavior in Houston in the months before he left, his abrupt leaving wearing summer clothes in mid-winter, his failure to get off a bus that passed right by his door, his grossly inadequate efforts to care for himself and connect with other people prior to being arrested all raise questions as to

how well his brain was working at the time. Whether he had the capacity to understand a Miranda warning and to waive his rights is open to question. The history also raises a question about whether his capacity to form intent was substantially impaired.

\* \* \* \* \* \*

In my evaluation this patient repeatedly demonstrated confabulation. Patients with organic brain syndromes frequently make up answers to questions they cannot answer factually, either because of memory deficits or other intellectual deficits. I believe that much of what this patient's answers represent is confabulation by a man with severe intellectual impairments.

... Is he malingering? I don't think so. He is not giving any fantastic or absurd answers except for one or two. He stops that when confronted. The main content of his responses all illustrate profound intellectual impairment. This is confirmed by the State's intelligence testing on the Wechsler. What looks like malingering in some cases is I think rather primitive confabulation.

Dr. Beck's Report at 14–15 (Petitioner's Exhibit 1 at November 16, 1989 Hearing).

The significance of Dr. Beck's report to this court is not that it establishes the petitioner's incompetence in 1981,[18] but that it demonstrates the assistance that would have been available to the petitioner had his attorneys chosen to seek it. In the opinion of this court, the probability is great that professional psychiatric assistance in this case would have made a significant difference at both the guilt and penalty phases of the petitioner's trial. The respondents argue that decisions of trial strategy should not be second-guessed by this court. This court is not of the opinion that the decisions made by trial counsel to reject the insanity defense, to reject the assistance of independent expert assistance on behalf of the petitioner, and to proceed to trial in the face of the petitioner's alleged inability to assist in his defense were the result of investigation and considera-

tion of the best course to follow in protecting the petitioner's interests. Bernard and King appear instead to have simply let events in the case carry them along, and such conduct is not entitled to deference. They did not utilize sufficient skill and knowledge as would have rendered the trial a reliable adversarial testing process.

After considering all the circumstances of this case, this court concludes that the petitioner's trial lawyers failed to subject the prosecution's case to meaningful adversarial testing, and that the adversarial process in this case was presumptively unreliable. The performance of the petitioner's trial counsel was "so inadequate that, in effect, no assistance of counsel [was] provided." *Cronic*, 466 U.S. at 654, 104 S.Ct. at 2044.

### 2. Whether appellate counsel rendered ineffective assistance

■ The standard for ineffective assistance of counsel is the same for both trial and appellate lawyers. *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir.1987). The two-part *Strickland* analysis must, therefore, be applied to the petitioner's appellate counsel as well.

#### a. *Whether appellate counsel's performance was deficient*

■ The petitioner contends that his appellate counsel was defective because none of those lawyers raised the *Pate* and *Beck* violation claims that have been raised in the petition for writ of habeas corpus before this court. The respondents argue that these lawyers were simply winnowing out weaker arguments and focusing on those more likely to prevail, which is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 Ed.2d 434 (1986). Had appellate counsel done what the respondents argue, this court would agree with that contention. There was no winnowing process in this case. Instead, the petitioner's lawyers missed important and arguable constitutional violations that are

---

**18.** Because this court is of the opinion that the petition for writ of habeas corpus is due to be granted on other grounds, it need not make that determination.

obvious from even a cursory reading of the record.

In *Matire*, which involved improper comment on Matire's right to remain silent but is otherwise factually similar to the instant case, the Eleventh Circuit held as follows:

> We conclude that counsel's failure to raise the Fifth Amendment issue causes his performance to fall below that wide range of competence required of attorneys in criminal cases. The improper comment was obvious on the record, and must have leaped out upon even a casual reading of transcript.... Moreover, the fact that such comments were in violation of the Fifth Amendment was widely known at the time.... We find no merit in the state's argument that appellate counsel might have deemed the Fifth Amendment violation harmless, thus excusing his failure to raise the issue. First, at the time appellate counsel's brief on direct appeal was filed, ... the law of Florida clearly provided that such an error was reversible without regard to harmless error doctrine. Second, as indicated in the discussion above, the Fifth Amendment violation was not harmless. Our conclusion that counsel's performance was substandard is bolstered by the fact that appellate counsel's brief on direct appeal raised only a single, weak issue, notwithstanding the fact that a substantial, meritorious Fifth Amendment issue was obvious upon even a casual reading of the trial transcript.... We cannot conclude that the "adversarial testing process" worked in Matire's direct appeal.

811 F.2d at 1438 (citations omitted) (footnotes omitted).

In the opinion of this court, the petitioner received ineffective assistance of appellate counsel until the appearance on his behalf of his present attorneys. At the time of the representation provided by Roney, McKoon, and Newman, *Pate* and *Beck* had long been decided, and violations of the constitutional safeguards mandated therein were being challenged in Alabama's appellate courts and in federal courts. Further-

more, as this court has already indicated, the *Beck* violation denied the petitioner a fundamentally fair trial. This court finds it ironic that the appellate lawyers, while attempting to focus on the ineffective assistance of counsel rendered to the petitioner at the trial level, rendered ineffective assistance themselves at the appellate level by their failure to raise the substantial and meritorious constitutional issues presently before this court.

This court is also concerned that, despite continuing doubts about the petitioner's mental competence, exhibited by voiced concerns from his lawyers about his ability to aid them in representing him on appeal, none sought to have the petitioner further evaluated until Newman began his representation.[19] Roney, who represented the petitioner at the evidentiary hearing referenced numerous times herein, discussed at the conclusion of the hearing the difficulties he had encountered in obtaining assistance from the petitioner, and stated his view that the petitioner was at that time incompetent.

> Your Honor, just from my observations and I have only had a short time to talk to Mr. Daniel and even here today Mr. Daniel—I have not been able to elicit anything with regard to what happened from those events. He doesn't recall any of the events that happened leading up to Hurtsboro or how he got to Hurtsboro. I asked Mr. Daniel if he wanted to talk with his mother and he doesn't even really want to talk with his people. He has no hostility that I know of. I do feel that in my opinion that Mr. Daniel could not assist counsel if he was placed or put back to trial at this time because of the fact that I have not been able to communicate with him with regard to any of the facts that might have occurred or what might have led him to arrive in Hurtsboro, Alabama. I feel like that in the sense of justice that a new trial should be ordered and that there should be a psychiatric examination—one which

---

19. Loftin, appointed to represent the petitioner when this court ordered a new sentencing hear-

ing, also attempted to have the petitioner's mental status further evaluated.

would delve into the problem that he is suffering under at the present time. (Supp.Tr. at 67–68.) Newman, when ordered by this court to search the record for any other claims that should be raised by amended habeas corpus petition, attempted to consult with the petitioner, who apparently did not understand the import of their discussion. At the hearing on the petitioner's 60(b) motion in April 1989, Newman testified that the petitioner was incoherent when he attempted to communicate with him, and that the petitioner was unable to provide meaningful assistance in his case.

The court is also of the opinion that, far from excusing the failure on the part of the petitioner's appellate lawyers to raise clear constitutional violations, the petitioner's alleged mental incompetence and inability to assist his lawyers exacerbates their failure to provide competent representation to a defendant who most needed their advocacy.

### b. *Whether the petitioner was prejudiced by appellate counsel's performance*

■ This court concludes that the petitioner was prejudiced by his appellate counsel's deficient performance. Had the *Beck* violation been brought to the attention of the Alabama Court of Criminal Appeals and the Supreme Court of Alabama and appropriately briefed, there is a reasonable probability that the outcome of the petitioner's appeal would have been different. Furthermore, in view of Alabama's procedural default rules, the petitioner would most certainly have been prejudiced by the preclusion of a valid claim on petition for writ of habeas corpus had he not been able to show cause for and prejudice from the default.

### D. *Whether the petitioner's statement was illegally obtained*

■ The petitioner contends that inadequate *Miranda*[20] warnings were given prior to his giving a statement to the police, that his mental state precluded a knowing waiver of counsel and, therefore, that the statement should not have been used against him. The court finds no merit to this contention. The record indicates that

the officers who obtained the petitioner's statement did advise him of his *Miranda* rights and that the petitioner did not appear to have difficulty communicating with them at that time. In the opinion of this court, the statement was not illegally obtained. This court is further of the opinion that its introduction did not prejudice the petitioner, since in the statement he denies any knowledge of the offense with which he was charged.

### E. *Whether the petitioner's participation in a lineup violated his right to counsel*

■ The petitioner participated in a lineup approximately one hour after he was taken to the Russell County jail. He had previously been given his *Miranda* rights. Although a post-indictment lineup is considered a "critical stage" in the prosecution, at which the accused must be given the right to be represented by counsel, *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the United States Supreme Court has not extended *Wade*'s per se exclusionary rule to pre-indictment confrontations. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). A pre-indictment lineup that is unnecessarily suggestive and conducive to mistaken identification would still be violative of due process, however. *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). In the opinion of this court, the lineup in which the petitioner participated was not violative of due process.

### F. *Whether the death penalty should be applied to the mentally handicapped*

■ The petitioner also argues that subjecting defendants with mental handicaps to the death penalty constitutes cruel and unusual punishment. In light of the United States Supreme Court's opinion in *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), this court finds no merit to this contention.

---

**20.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## IV. CONCLUSION

In the opinion of this court, because the petitioner was denied the right to effective trial and appellate counsel, coupled with the *Beck* violation, the amended petition for writ of habeas corpus is due to be granted, and the petitioner is entitled to a new trial.

A separate order will be entered in accordance with this memorandum opinion.